Filed 4/23/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| ISAAC AGAM, | H038537, H039031 |
| Plaintiff, Cross-defendant and Respondent, | (Santa Clara County Super. Ct. No. 1-09-CV143471) |
| v. | |
| ELIYAHU GAVRA et al., | |
| Defendants, Cross-complainants and Appellants. | |

Shortly before the collapse of the housing market and the onset of the Great Recession, appellants Eliyahu and Yifah Gavra, respondent Isaac Agam, and Eran Cohen formed a partnership to purchase and develop a parcel of land in Los Altos Hills. The partners planned to subdivide the property and build two or three houses for resale. They successfully purchased and subdivided the property into three lots, but financial issues and personality conflicts derailed their development plans. Between 2009 and 2011, they sold the vacant lots, losing close to $1.3 million on the project.

In 2009, Agam and Cohen sued the Gavras for breach of the Partnership Agreement and breach of their fiduciary duties to the partnership. The Gavras filed a cross-complaint alleging a claim for breach of contract, among others. Cohen reached a settlement with the Gavras and the cross-actions between Agam and the Gavras proceeded to a bench trial. The trial court rejected the Gavras' breach of contract claim and concluded they had breached both the Partnership Agreement and their fiduciary duties. The court awarded Agam more than $700,000 in reliance damages on the breach

of contract claim, no damages on the breach of fiduciary duty claim, and more than $245,000 in attorney fees.

On appeal, the Gavras contend the trial court misallocated the burden of proof on Agam's breach of contract claim. They also challenge the sufficiency of the evidence supporting the judgment. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. *The Partnership Agreement and Purchase of the Los Altos Hills Property*

In April 2007, Agam, Cohen, and the Gavras entered into a partnership agreement (the Partnership Agreement). In that contract, they agreed to purchase a parcel of land in Los Altos Hills, "subdivide it[,] . . . build two or three houses on it[,] and sell [them] at a maximum profit." They further agreed that Agam would have a 45 percent interest in the partnership; Cohen, a 25 percent interest; and the Gavras, a 30 percent interest. The Partnership Agreement required the partners to contribute money and time to the project proportionate to their partnership share. The Partnership Agreement authorized Agam--a mortgage broker with real estate development experience--to make the final decision on any disputed issues after consulting with the partnership. The Partnership Agreement also permitted any partner to terminate active participation in the partnership upon 45 days notice and to become a passive participant upon the consent of the other partners.

Agam and Cohen purchased the Los Altos Hills property for $4.6 million. The purchase was financed by a seller carryback loan (the Driscoll Loan) of $3.8 million, due in a balloon payment on November 1, 2008. Agam and Cohen executed a grant deed transferring title to the Los Altos Hills property to the partners in proportion to their partnership interests.

### B. *Early Development and Clashes Among The Partners*

In the summer and fall of 2007, the partners met with a real estate agent and an architect to explore options for developing the land. They considered whether to build smaller, less expensive homes (6,000 square foot homes priced in the $6 million range)

2

that the real estate agent advised would sell more quickly, or larger, more expensive homes (9,000 square foot homes priced in the $9 million range) that likely would take longer to sell. They favored building larger homes. The partners also began the process of obtaining the necessary approval to subdivide the parcel into three lots, which they obtained in October 2008.

At an October 2007 meeting between the partners and an architect, Agam yelled at Eliyahu Gavra (Eli) when the two disagreed about the design of one of the planned homes. E-mails among the partners following that incident acknowledge the existence of "friction" and "personality and style differences" between Agam and Eli.

Agam and Cohen offered to buy the Gavras out in November 2007. Eli countered with a higher buy-out figure. The partners did not reach an agreement and the partnership remained intact.

### C.   *The Driscoll Agreement*

In mid-2008, the partners took various steps to raise the $3.8 million needed to pay off the Driscoll Loan by the November 1, 2008 due date. In particular, they decided to sell one of the lots and, in August 2008, entered into an agreement to sell lot No. 2 for $2.7 million. They also sought to obtain a land loan secured by the other two lots. Agam initially prepared a joint loan application on behalf of the partnership. However, issues related to Cohen's other investments made him ineligible for a loan. Therefore, Agam and the Gavras obtained loans as individuals. Cohen and the Gavras quit claimed their ownership interests in lot No. 3 to Agam, who obtained a $1,325,000 land loan secured by that lot from Borel Bank in October 2008. Similarly, Cohen and Agam quit claimed their ownership interests in lot No. 1 to the Gavras, who obtained a $1,325,000 Borel Bank land loan secured by lot No. 1, also in October 2008. In connection with the land loans, Borel Bank required both Agam and the Gavras to keep $100,000 on deposit with the bank. The Gavras requested that Cohen contribute his 25 percent share ($50,000) of those deposits, but Cohen responded that he could not because he was "out of money and

3

maxed out on all [his] credit cards."

The sale of lot No. 2 fell through in October 2008. The partners had planned to use the proceeds from the sale to pay off the Driscoll Loan. They were out of cash and the recently obtained land loans were insufficient to cover the required $3.8 million payment.

The partners partially paid off the Driscoll Loan using the proceeds from the Borel Bank land loans and negotiated an extension for the remainder of the loan until December 1, 2008. To pay off the remainder of the loan, the partners discussed obtaining a hard money loan secured by lot No. 2. The Gavras were reluctant to participate in a hard money loan due to the high rate of interest associated with such a loan and the requirement that they use their home as cross-collateral. Instead, the Gavras paid their share (about $335,000) in cash, which they obtained by taking out a $550,000 home equity line of credit.[1] Agam and Cohen contributed some cash and obtained a $700,000 hard money loan secured by lot No. 2. Eli testified that his contribution of cash eliminated the need for Agam and Cohen to use their properties as cross-collateral by reducing the amount of the hard money loan.

It was necessary that the Gavras quit claim their ownership interest in lot No. 2 to Agam and Cohen so that they could obtain the hard money loan secured by that lot. Agam requested that the Gavras do so on Wednesday, November 26--the day before Thanksgiving and five days before the Driscoll Loan was due. Initially, the Gavras refused to sign anything without an agreement among the partners "securing [the Gavras'] position" and indicated that their personal attorney was drafting such an

---

[1] The Gavras covered 30 percent of the remainder of the Driscoll Loan despite the fact that their Borel Bank land loan had already covered a sizable portion of that loan while Cohen had contributed nothing. Thus, as Eli testified, he and his wife were required to pay approximately 45 percent of the Driscoll Loan; more than their 30 percent share in the partnership.

4

agreement. The partnership's attorney, Desmond Tuck, advised the Gavras "to discuss with your lawyer whether what you are doing constitutes a breach of fiduciary duty towards your partners" by allowing "your desire to protect yourself . . . to take priority over the interest of the partnership." Tuck further advised the Gavras to "sign the documents for the sake of the partnership, and if you don't come to an agreement . . . before Monday [when the Driscoll loan is due] . . . , you can revoke your instructions to the title company." The Gavras signed the necessary documents.

The partners, the Gavras' attorney, and Tuck, met on the evening of Sunday, November 30, to discuss the Gavras' proposed agreement. The negotiations extended into the early hours of December 1, the day the Driscoll Loan payment was due. Cohen testified that the Gavras threatened to allow the Driscoll Loan to go into default unless an agreement was reached. Agam likewise testified that the Gavras "refused to bring their cash [to help pay off the Driscoll Loan] unless we signed some guarantees for them." At approximately 2:00 a.m. on December 1, the parties signed the so-called Driscoll Agreement.

The Driscoll Agreement provided that the Gavras would receive a deed of trust on lot No. 2 to secure their $335,000 investment.[2] It further required Agam and Cohen to execute a deed transferring title to lot No. 2 to all three partners. That deed would be held by the Gavras and recorded at their "discretion, after considering any detrimental consequences to the partnership," "to protect [the] Gavra[s'] interest." Finally, the Driscoll Agreement called for the proceeds from the sale of any lot to go directly to the partners. (The Partnership Agreement had provided that the proceeds from the sale of

---

[2] "In practical effect, if not in legal parlance, a deed of trust is a lien on the property." (*Monterey S.P. Partnership v. W. L. Bangham, Inc.* (1989) 49 Cal.3d 454, 460.) It is a security instrument that entitles the lender on a real property loan to reach some asset of the debtor if the note is not paid. (*Alliance Mortgage Co. v. Rothwell* (1995) 10 Cal.4th 1226, 1235.)

5

partnership property would be paid to the partnership.)

The partners paid off the remainder of the Driscoll Loan on time.

It is undisputed that no deed of trust was executed as called for by the Driscoll Agreement.

### D. *Continued In-Fighting Leads to Litigation*

In a letter to Agam, the Gavras' attorney stated that, given the "worsening economy and real estate market" and the partners' "dire financial situation," "it is [the Gavras'] position that the partnership cannot proceed to the construction phase and the partners should focus their efforts on selling the lots." The letter further advised Agam that he had breached the Partnership Agreement by failing to discuss partnership issues with the Gavras and making decisions without consulting with them. Finally, the letter proposed listing lot No. 2 for sale and requested a written response to that proposal by February 16, 2009. (Lots Nos. 1 and 3 already were listed for sale.)

Agam and Cohen responded on February 23, 2009. Each took the position that the decision not to list lot No. 2 had been made by a majority of the partnership. Each also leveled various accusations against the Gavras, including that they had failed to actively participate in the partnership as required by the Partnership Agreement and had breached their fiduciary duties by insisting upon the Driscoll Agreement.

In a response letter, the Gavras' attorney reiterated the Gavras' desire to put lot No. 2 on the market and not to proceed with construction. He requested a written response by March 10. Agam and Cohen did not respond. On March 13, 2009, the Gavras' attorney stated in a letter to Agam and Cohen that the Gavras "cannot be expected to further fund any expenses, other than for the sale of the lots, until I have received responses from you."

Agam and Cohen retained an attorney. Through that attorney, on March 26, 2009, they proposed that the Gavras withdraw from the partnership, take any one of the three lots, and accept (or make) true-up payments, depending on which lot they selected.

Under Agam and Cohen's proposal, the true-up payments would be calculated using Eli's own estimated values of the three lots. The Gavras rejected that offer.

On May 28, 2009, Agam and Cohen filed suit against the Gavras, alleging they breached the Partnership Agreement by failing to pay their share of partnership expenses. The Gavras filed a cross-complaint a month later, alleging Agam and Cohen had breached the Partnership Agreement and the Driscoll Agreement; the cross-complaint also sought to dissolve the partnership.

### E.    Borel Bank's Loan Requirements and Agam's Loan Application

Despite the Gavras' position that construction was not an economically viable option, Agam and Cohen opted to proceed towards construction. Agam testified that they "decided to go in two parallel paths[:] . . . prepar[e] all the lot[s] for sale, and at the same time . . . [obtain] building permit[s] and even . . . [a] construction loan." According to Agam, he and Cohen had not decided yet whether "to actually construct." He viewed obtaining a construction loan as a way to pay off the Borel Bank land loans. In addition, obtaining planning approval and construction loans would, in his view, make the lots more attractive to buyers. He noted that it was difficult to obtain a land loan at the time; thus, he believed that putting a construction loan in place "was the only way a potential buyer would be able to" finance purchasing the land. Agam represented to a Borel Bank loan officer on August 11, 2009, that the partners would start construction if approved for a construction loan.

In a June 2009 e-mail to the Gavras, Cohen characterized obtaining a construction loan as the only "alternative" to "default [on the land loans] and foreclosure." He further stated "[w]hile we have decided to try and sell lots ([a]t least one), we have never decided not to construct, and if this will be our only alternative, then we will probably construct."

In June 2009, Agam prepared a joint application for a $4.878 million construction loan for lot No. 3 on behalf of all the partners. That application estimated the future value of the home to be built on that lot to be $9.4 million. It also estimated that the

7

Gavras had $865,000 in liquid assets and that, collectively, the partners had more than $1.6 million in liquid assets. Eli testified that after paying off the Driscoll Loan his liquid assets consisted of "basically just the money from the line of credit." He further testified that the partners never discussed a joint construction loan application. According to Eli, they discussed Agam obtaining a construction loan for lot No. 3 and the Gavras obtaining a construction loan for lot No. 1.

The Gavras reiterated their refusal to proceed with construction on several occasions in June and July 2009. Agam testified that, accordingly, he did not submit the joint application and instead opted to apply for a construction loan as an individual.

Borel Bank loan officer John Noble testified for Agam. Noble testified that Borel Bank decides whether to make a loan on a case-by-case basis based on various factors. Among the "primary underwriting criteria" are the cost-to-equity (or loan-to-cost) ratio and the loan-to-value ratio. For construction loans, Borel Bank generally requires a loan-to-cost ratio of no greater than 73 or 74 percent. Put differently, there must be at least 26 percent equity invested in the project. The required loan-to-value ratio varies depending on whether the planned home will be occupied by the borrower ("owner occupied") or not. Noble testified that Borel Bank "might do a higher loan to value [ratio] for an owner occupied project" because they are considered less risky. He further testified that Borel Bank might allow a higher loan-to-value ratio if the borrower's cash flow is strong.

Noble noted that the identity of the borrower must match the identity of the property owner. So if "[t]he property is vested in the name[] of [an] individual[]" then "the borrower is an individual." On cross-examination, the Gavras' counsel asked Noble whether Borel Bank would have approved a joint construction loan application, had one been submitted on behalf of all of the partners. The trial court sustained Agam's counsel's objection to the question on the ground that it was an incomplete hypothetical.

Agam applied to Borel Bank for a $5.2 million construction loan for lot No. 3 in July 2009. The loan-to-cost ratio on Agam's application was 77 percent. He met with

8

Borel Bank executives in August 2009 regarding that application. He testified that, at that meeting, he was told the loan-to-cost ratio "is not an issue." Following the meeting, Borel Bank required an appraisal of the property. The appraiser valued the proposed home on lot No. 3 at $7.2 million. Agam, who had valued the home at $9 million, disagreed with the appraisal. He believed the appraiser undervalued the finished basement square footage. Agam requested a second appraisal, but none was completed. The lower than expected appraisal negatively impacted the loan-to-value ratio.

Agam's application was declined. Noble testified that the application was declined because of the cost-to-equity and loan-to-value ratios, and because of other concerns. Agam testified he was told the loan was denied based on the loan-to-value ratio only, which he believed had been skewed by the too-low appraisal.

In July 2009, Eli met with Noble to discuss a possible construction loan from Borel Bank. They discussed Borel Bank's lending criteria, including the 26 percent equity requirement. The Gavras never applied for a construction loan.

Noble testified that while Borel Bank dealt with Agam and the Gavras separately, he was aware of their partnership and the friction between them and that he reported that friction to his superiors.

In a letter dated March 4, 2010, Borel Bank notified Agam that "the maximum loan [it] would approve for the project would be $3,775,000 and would require minimum cash equity approximately equal to one-third of the total project costs." Agam did not pursue the smaller loan. He testified that he opted not to do so because the Gavras held a grant deed indicating their interest in lot No. 3, which he believed would enable them to prevent construction or interfere with the loan.

Agam testified that he nevertheless considered various construction scenarios based on a $3,775,000 loan. One scenario involved the construction of the originally planned 9,000 square foot house. To construct such a house using the smaller loan, Agam testified that the partners would have been required to come up with $1.4 million.

9

He opined that the partners had $1.6 million in reserves. Moreover, he noted that by 2010 the partners had sold lot No. 1 and, absent the Driscoll Agreement, the proceeds from that sale would have gone to the partnership. A second scenario involved building a house with a smaller basement. In that scenario, the partners would have needed to come up with $845,000 and, according to Agam's projections, would have lost a total of $220,000 on the development project. Instead, they lost $1,277,114 on the project.

### F. Sale of the Undeveloped Lots

The partners sold lot No. 1 for $1.7 million in December 2009. They sold lot No. 2 in November 2010, for $1.9 million and lot No. 3 for $1.92 million in February 2011.

### G. Evidence of Agam's Claimed Damages

Agam sought damages in the form of out-of-pocket losses, lost time and opportunities, and lost profits. With respect to his out-of-pocket losses, Agam presented evidence that the partnership spent a total of $6,441,519 to purchase and improve the lots. He also adduced evidence that the partnership received $5,164,405 when it sold the lots, resulting in a loss of $1,277,114. Agam's 45 percent share of that loss was $574,701. The evidence further indicated that Agam made payments of $157,500 to the hard money lender. Finally, Agam presented evidence that the Gavras owed him $4,255.74 for partnership expenses.

### H. Bench Trial, Final Statement of Decision, and Judgment

The court held a nine-day bench trial in June 2011. It issued its final statement of decision on May 16, 2012.

The court concluded the Gavras had breached the Partnership Agreement by refusing to go to construction or "to pay for any Partnership expenses other than those dedicated to the sale of the undeveloped lots." According to the court, "[t]he Gavras' breaches were both actual (cutting off their contributions of time and money for a period of time) and anticipatory (declaring they will not support a construction loan)." With respect to causation, the court found persuasive Agam's contention that the Gavras'

10

breaches caused the partners not to submit a joint construction loan application. The court concluded that "the Gavras' refusal to participate in any way in obtaining a construction loan prevented Agam from applying for a construction loan backed in part by the Gavras' assets" and thus "effectively prevented Agam from pursuing the chief aims of the Partnership Agreement: obtain a construction loan, build a home on the property, and 'sell it at a maximum profit.' " The court then concluded that "the Gavras' breaches were a substantial factor in causing harm to the Partnership, and hence to Agam."

As to damages, the court concluded Agam had failed to establish lost profits or opportunity losses with sufficient certainty. However, it found he had shown $732,201 in out-of-pocket losses. According to the court, the Gavras bore the burden to show that amount should be reduced because the contract was a losing one for Agam, and they "failed to establish any projected loss with reasonable certainty." The court further awarded Agam $4,255.74 on an internal partnership accounting.

The court also held that the Gavras had breached the implied covenant of good faith and fair dealing and breached their fiduciary duties, but it awarded no additional damages on those claims. One of the fiduciary duty breaches the court found was "[t]he Gavras' conduct in securing the Driscoll Agreement," which the court found "constituted adverse pressure on Agam and Cohen."

The court rejected the Gavras' claim that Agam breached the Partnership Agreement and the Driscoll Agreement. With respect to the Partnership Agreement, the court concluded the Gavras' own breaches precluded them from recovering for Agam's alleged breaches. And the court reasoned that enforcing the Driscoll Agreement would reward the Gavras for breaching their fiduciary duties to Agam and the partnership.

The court entered a $736,456.74 judgment in favor of Agam on May 16, 2012. The Gavras timely appealed on July 12, 2012 (H038537).

Agam moved for an award of attorney fees on July 13, 2012. The trial court

11

awarded Agam $245,026.77 in attorney fees on October 26, 2012. The Gavras timely appealed that award on November 26, 2012 (H039031).

This court ordered the two appeals--H038537 and H039031--considered together for purposes of briefing, oral argument, and disposition.

## II.    DISCUSSION

The Gavras challenge the trial court's resolution of the parties' breach of contract claims. With respect to Agam's breach of contract claim, they contend the court erroneously allocated the burden of proof on certain elements to them. They further maintain that even if the court properly allocated the burden of proof, the damages award cannot stand because (1) they proved Agam would have suffered a loss had they not breached such that he is not entitled to reliance damages, (2) the damages award is excessive, and (3) Agam failed to mitigate his damages. As to their claim that Agam breached the Driscoll Agreement, the Gavras argue that agreement was not the product of a fiduciary duty breach, such that the court erred by refusing to enforce it. Finally, the Gavras assert the attorney fee award must be reversed if this court reverses the judgment in favor of Agam on their breach of contract claim. We address each contention in turn.

### A.    *Agam's Breach of Contract Claim*

"A cause of action for damages for breach of contract is comprised of the following elements: (1) the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to plaintiff." (*Careau & Co. v. Security Pacific Business Credit, Inc.* (1990) 222 Cal.App.3d 1371, 1388.) "Implicit in the element of damage is that the defendant's breach *caused* the plaintiff's damage." (*Troyk v. Farmers Group, Inc.* (2009) 171 Cal.App.4th 1305, 1352, citing Civ. Code, § 3300.)

The first three elements of Agam's claim are undisputed. The Gavras do not contest (1) the existence and validity of the Partnership Agreement, (2) that Agam performed under the Partnership Agreement, or (3) that they breached the Partnership

12

Agreement. At issue is the fourth element--causation of damages. According to the Gavras, the trial court erroneously allocated the burden of proof on that element to them by requiring them to prove that Agam would have suffered a loss even if they had proceeded to construction. The Gavras maintain the burden should have been placed on Agam to show that, absent a breach, the partners would not have suffered a loss because (1) Borel Bank would have approved a $5.2 million joint construction loan application; (2) the partners would have used the loan funds for construction; and (3) construction of a home would have generated a gain.

Agam agrees he bore the burden to prove the Gavras' breach caused his damages, but he says the trial court properly held him to that burden. Agam maintains that, because he sought so-called reliance damages, he discharged his burden by showing the expenditures he made in reliance on the Partnership Agreement. It was the Gavras' burden, he urges, to prove Agam would have suffered a loss even if they had not breached.

Thus, the primary dispute on appeal centers on the nature of the burden of proving damages and causation where the plaintiff seeks damages in the amount of reliance expenditures.

### 1. Proving Causation of Reliance Damages

One proper "measure of damages for breach of contract is the amount expended [by the nonbreaching party] on the faith of the contract." (*Mendoyoma*, *Inc*. *v*. *County of Mendocino* (1970) 8 Cal.App.3d 873, 879 (*Mendoyoma*); 1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, § 883, p. 970 ["[One] measure of contract damages is the amount of the plaintiff's expenditures, together with the reasonable value of his or her own services, in preparation and performance in reliance on the contract."].) As our Supreme Court explained in *Buxbom v*. *Smith* (1944) 23 Cal.2d 535, 541, " '[w]here, without fault on his part, one party to a contract who is willing to perform it is prevented from doing so by the other party, the primary measure of damages' " includes " 'his

13

reasonable outlay or expenditure toward performance.' " That the nonbreaching party's damages include his or her "outlay incurred in making preparations for the contract" has been the law in California for over a century. (*Cederberg v. Robison* (1893) 100 Cal. 93, 99 (*Cederberg*); see also *United States v. Behan* (1884) 110 U.S. 338, 345-346 (*Behan*) [nonbreaching party's damages include "actual outlay and expenditure"].)

This measure of damages often is referred to as "reliance damages." (*US Ecology, Inc. v. State of California* (2005) 129 Cal.App.4th 887, 907; Rest.2d Contracts § 349.) It has been held to apply where, as here, "one party to an established business association fails and refuses to carry out the terms of the agreement, and thereby deprives the other party of the opportunity to make good in the business." (*Caspary v. Moore* (1937) 21 Cal.App.2d 694, 699; see also 13 Williston on Contracts (4th ed. 2013) § 39:12, pp. 605-606 [where the defendant's breach of contract "consists of the violation of the implied promise of cooperation present in all contracts" and prevents the plaintiff's performance, the plaintiff is "entitled to recover . . . any actual expenditures made in reliance on the contract"].)

With respect to the burden of proof, the United States Supreme Court stated in *Behan* that the nonbreaching party "is clearly entitled to recover" (*Behan*, *supra*, 110 U.S. at pp. 344-345) his or her "actual outlay and expense" (*id.* at p. 344) "unless the other party, who has voluntarily stopped the performance of the contract, can show the contrary." (*Id.* at p. 345.) The court reasoned that the breaching party, "who has voluntarily and wrongfully put an end to the contract, [cannot] say that the party injured has not been damaged at least to the amount of what he has been induced fairly and in good faith to lay out and expend . . . unless [the breaching party] can show that the expenses of the party injured have been extravagant, and unnecessary for the purpose of carrying out the contract." (*Id.* at pp. 345-346.) California courts have espoused the same rule. (*Cederberg*, *supra*, 100 Cal. at p. 99; *Blair v. Brownstone Oil & Refining Co.* (1917) 35 Cal.App. 394, 396; *Navarro v. Jeffries* (1960) 181 Cal.App.2d 454, 461.)

14

Thus, the burden is on the plaintiff to establish "the amount which he has been induced to expend." (*Mendoyoma*, *supra*, 8 Cal.App.3d at p. 879.) The burden then shifts to the defendant to show the nonbreaching party's expenses were unnecessary, such that his or her recovery of reliance damages should be reduced. (*Ibid.*)

Courts also have recognized a second limitation on reliance damages awards (aside from proof of unnecessary expenditures)--proof that the plaintiff would have suffered a loss even if the defendant had fully performed. "[I]n such a case the plaintiff should not be permitted to escape the consequences of a bad bargain by falling back on his reliance interest." (*Dialist Co. v. Pulford* (Md. Ct. Spec. App. 1979) 399 A.2d 1374, 1380.) Put differently, the plaintiff should not be put " 'in a better position than he would have occupied had the contract been fully performed.' " (*Bausch & Lomb Inc. v. Bressler* (2nd Cir. 1992) 977 F.2d 720, 729 (*Bausch & Lomb*).) Thus, much like courts allow the breaching party to prove the nonbreaching party's expenditures were unnecessary, courts allow the breaching party "to reduce [the nonbreaching party's recovery] by as much as he can show that the [nonbreaching party] would have lost, if the contract had been performed." (*L. Albert & Son v. Armstrong Rubber Co.* (2nd Cir. 1949) 178 F.2d 182, 189 (*L. Albert*); (*Holt v. United Sec. Life Ins. & Trust Co.* (1909) 76 N.J.L. 585, 597 (*Holt*) ["if he who, by repudiation, has prevented performance, asserts that the other party would not even have regained his outlay, the wrong-doer ought at least to be put upon his proof"]; *Westfed Holdings, Inc. v. United States* (Fed. Cl. 2002) 52 Fed.Cl. 135, 155 (*Westfed Holdings*) rev'd in part on other grounds, 407 F.3d 1352 (Fed. Cir. 2005) [plaintiff "must show that the expenses submitted as reliance damages were incurred in reliance on the contract . . . while defendant may prove, in diminution of the amount of losses proved by plaintiff, any losses that plaintiff would have incurred in the event of full performance of the contract"]; *Bausch & Lomb*, *supra*, at p. 729 ["a reliance recovery will be offset by the amount of 'any loss that the party in breach can prove with

15

reasonable certainty the injured party would have suffered had the contract been fully performed.' "].)

Courts allocate the burden of proof in this manner for two reasons. First, "[o]rdinarily, the performance of agreements results in advantage to both parties over and above that with which they part in the course of its performance; otherwise there would soon be an end of contracting." (*Holt*, *supra*, 76 N.J.L. at p. 597.) Therefore, it is reasonable to impose a rebuttable presumption "that the plaintiff's earnings from performance would have been at least sufficient to defray the plaintiff's reliance expenditures." (Rest.3d Restitution and Unjust Enrichment § 38, com. a; *Holt*, *supra*, at p. 597 [presuming "that complete performance of the agreement would . . . have resulted in at least reimbursing the injured party for his outlay fairly made in part performance of it"]; Fuller and Perdue, *The Reliance Interest in Contract Damages*: 2 (1937) 46 Yale L.J. 373, 375 n. 84 ["the courts seem to assume in favor of the plaintiff that he would have 'broken even,' unless, at least, the defendant is able to prove the contrary"].) Second, "[i]t is often very hard to learn what the value of the [breaching party's] performance would have been[,] and it is a common expedient, and a just one, . . . to put the peril of the answer upon that party who by his wrong has made the issue relevant to the rights of the other." (*L. Albert*, *supra*, 178 F.2d at p. 189.) That is, fairness requires placing the onerous burden of proving what would have been on the party at fault.

The requirement that the breaching party prove any losses the nonbreaching party would have incurred had the contract been fully performed does not, as the Gavras suggest, eliminate the requirement that the defendant's breach *caused* the plaintiff's damages. In the context of reliance damages, "[t]he value of the expenditures must have been lost as a result of the breach." (*Westfed Holdings*, *supra*, 52 Fed.Cl. at p. 161; *Chevron U.S.A.*, *Inc. v. United States* (Fed. Cl. 2014) 116 Fed.Cl. 202, 208 ["To demonstrate entitlement to reliance damages, a plaintiff must proffer evidence that '. . . the breach is a substantial causal factor in the damages.' "].)

16

No California court appears to have addressed the " 'losing contract' limitation upon awards of reliance damages." (*Bausch & Lomb*, *supra*, 977 F.2d at p. 729.) However, the reasoning employed in *Cederberg*, *Blair*, *Navarro*, and *Mendoyoma* indicates the burden lies with the breaching party to prove the nonbreaching party's reliance damages should be limited. Accordingly, we hold that, in the context of reliance damages, the plaintiff bears the burden to establish the amount he or she expended in reliance on the contract. The burden then shifts to the defendant to show (1) the amount of plaintiff's expenses that were unnecessary and/or (2) how much the plaintiff would have lost had the defendant fully performed (i.e., absent the breach). The plaintiff's recovery must be reduced by those amounts.

### 2.    *The Trial Court Properly Assigned the Burden of Proof*

In assessing Agam's breach of contract claim, the trial court properly held the parties to their respective burdens. It concluded Agam carried his burden to establish his expenditures and that "the Gavras' breaches were a substantial factor in causing harm to the Partnership, and hence to Agam." (The Gavras do not challenge the finding that Agam established his expenditures on appeal.) The court then concluded the Gavras did not discharge their burden to show Agam would have incurred a loss even if they had fully performed. The Gavras challenge this second finding as unsupported by sufficient evidence.

To the extent the Gavras challenge the trial court's finding that Agam carried his burden to show causation as unsupported by sufficient evidence, we reject that argument. As the Gavras knew or should have known, the success of the partnership depended on the construction of homes for sale. This was the sole goal of the partnership as set forth in the Partnership Agreement. In reliance on that agreement, Agam made significant expenditures. The Gavras refusal to participate in construction prevented the partnership from attaining its goal. No greater causal link between the Gavras' breach and Agam's damages need be established.

17

### 3. Sufficiency of the Evidence

The Gavras maintain that, even assuming they bore the burden of proving Agam would have lost money had they fully performed, the trial court erred by finding that they did not sustain that burden.

### a. Standard of Review

Where, as here, " 'the trier of fact has expressly or implicitly concluded that the party with the burden of proof did not carry the burden and that party appeals' " (*Sonic Manufacturing Technologies*, *Inc*. *v*. *AAE Systems*, *Inc*. (2011) 196 Cal.App.4th 456, 465 (*Sonic*)), " 'the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law.  [Citations.]  Specifically, the question becomes whether the appellant's evidence was (1) "uncontradicted and unimpeached" and (2) "of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding." ' " (*Id*. at p. 466.)

### b. Uncontradicted and Unimpeached Evidence Does Not Prove With Reasonable Certainty the Amount Agam Would Have Lost Absent the Gavras' Breach

The question before us, then, is whether uncontradicted and unimpeached evidence compelled the conclusion that Agam would have lost a particular sum of money had the contract been fully performed.[3]  It does not.  To the contrary, what might have happened had the parties attempted to proceed with construction is speculative--an argument the Gavras themselves advanced at trial.

---

[3] The Gavras argue that the partners could not have made a profit if they had proceeded to construction on lot No. 3.  But that argument misconstrues the relevant inquiry.  The question is not whether the partners (and thus Agam) would have suffered some undefined loss even if they had proceeded to construction.  As discussed above, Agam's reliance damages award may be reduced by the amount of proven losses.  Therefore, the Gavras must prove with *reasonable certainty* the *amount* Agam would have lost had they not breached.

18

The Gavras contend Borel Bank would not have approved a $5.2 million joint construction loan because the partners could not satisfy the loan-to-cost ratio and loan-to-value ratio requirements for such a loan and because all three partners did not hold title to any lot. Even assuming they are right, that the partners could not have obtained a $5.2 million joint construction loan does not compel the conclusion that Agam's reliance damages must be reduced. The evidence shows the partners may have been able to proceed to construction by obtaining one or more smaller loans as individuals. Evidence was presented that Borel Bank was willing to loan Agam $3.77 million, subject to the condition that he have an amount equal to one-third of the total project costs invested in the property. Agam testified that, using such a loan, the partners could have built a smaller house and reduced their loss from $1,277,114 to $220,000.

The Gavras contend that the partners could not have obtained a $3.77 million loan because they did not have enough cash to meet Borel Bank's minimum cash equity requirement.[4] For that argument, they rely on Agam's estimated total project costs for the planned 9,000 square foot house. But they offer no evidence as to the cost of a smaller house. Nor do they cite to uncontradicted evidence showing how much cash the partners actually had on hand. They argue the partners had no more than $959,000 in liquid assets in June 2009, based on Agam's estimates of his and Cohen's assets and on Eli's vague testimony that "I think what I got [in November 2008] is basically just the money from the line of credit." But the Gavras themselves question the validity of Agam's estimates. Moreover, the Gavras had an additional $100,000 deposited with

---

[4] Oddly, in the context of their failure to mitigate argument, the Gavras credit Agam's testimony that the partners could have reduced their losses by approximately $1 million by accepting a $3.77 million construction loan. In faulting Agam for not taking such a loan, they ignore their irreconcilable claim that all of the partners combined (let alone Agam, without their additional assets) could not have satisfied the minimum cash equity requirement.

Borel Bank in connection with the lot No. 1 land loan. The December 2009 sale of lot No. 1 also provided the partners with an additional $262,740 in cash. Therefore, uncontradicted evidence does not show that the partners lacked the cash necessary to qualify for a $3.77 million construction loan.

For the same reasons, the evidence does not prove that the partners could not have constructed a home and at least reduced their losses, if not profited.[5] Of course, one can only speculate as to what size loan the partners would have obtained, how much construction would have cost, and how much they would have sold a house for in the but-for world of no breach. Accordingly, the Gavras failed to prove what losses Agam would have suffered had they fully performed by cooperating with the construction phase of development and the trial court did not err in refusing to reduce Agam's reliance damages.[6]

### 4. The Damages Awarded Are Not Excessive

The Gavras argue the award of damages was excessive because it included Agam's expenditures on lot No. 2. The Gavras contend those expenses should not be

---

[5] The Gavras also maintain the evidence shows Agam and Cohen did not plan to build even if they obtained a construction loan, such that the acceptance of any loan would have been fraudulent. Not so. Both Agam and Cohen testified that they always considered constructing on at least one lot to be a viable option. Thus, uncontradicted and unimpeached evidence does not compel the conclusion that any construction loan would have been fraudulent because Agam and Cohen did not intend to build.

[6] In view of the foregoing, we conclude the Gavras have failed to carry their burden to show the trial court committed reversible error when it precluded Noble from testifying as to whether Borel Bank would have approved a $5.2 million joint construction loan application. Assuming the court erred, the error is not reversible absent a showing by the Gavras of prejudice, meaning " ' "it is reasonably probable a result more favorable to [them] would have been reached absent the error." ' " (*Tudor Ranches, Inc. v. State Comp. Ins. Fund* (1998) 65 Cal.App.4th 1422, 1431-1432.) The admission of Noble's testimony could not have altered the outcome because, as discussed above, even assuming the bank would have denied a joint loan application, the Gavras failed to show how much Agam would have lost had they fully performed.

20

included because the partners had agreed to sell that lot before the Gavras refused to proceed with construction. Accordingly, they say, Agam's lot No. 2 expenses were not incurred in reliance on the Gavras' promise to cooperate with a joint construction loan.

That argument misconstrues the nature of both the promise at issue and reliance damages. At issue is the Gavras' promise to cooperate with construction. That promise was made in the Partnership Agreement at the outset of the development project. All of the partners' expenditures on the project--regardless of the lot--were made in reliance on the Partnership Agreement. The partners treated the development of all three lots as a single venture designed to maximize profits. The Gavras offer no persuasive argument as to why the expenditures on the different lots should be segregated at the damages stage.

### 5. *Failure to Mitigate*

The Gavras maintain Agam failed to mitigate his damages by obtaining a $3.77 million construction loan from Borel Bank and building a smaller home on lot No 3.

"The doctrine of mitigation of damages holds that '[a] plaintiff who suffers damage as a result of . . . a breach of contract . . . has a duty to take reasonable steps to mitigate those damages and will not be able to recover for any losses which could have been thus avoided.' " (*Valle de Oro Bank v. Gamboa* (1994) 26 Cal.App.4th 1686, 1691.) Under the doctrine, "[a] plaintiff may not recover for damages avoidable through ordinary care and reasonable exertion." (*Ibid.*) However, "[t]he duty to mitigate damages does not require an injured party to do what is unreasonable or impracticable." (*Ibid.*)

"Whether a plaintiff acted reasonably to mitigate damages . . . is a factual matter to be determined by the trier of fact." (*Powerhouse Motorsports Group*, *Inc. v. Yamaha Motor Corp. U.S.A.* (2013) 221 Cal.App.4th 867, 884.) The burden of proving a plaintiff failed to mitigate damages is on the defendant. (*Ibid.*) Here, the trial court concluded the Gavras did not carry that burden. Therefore, the question on appeal is whether there was " ' "uncontradicted and unimpeached" [evidence] "of such a character and weight as to

21

leave no room for a judicial determination that it was insufficient to support" ' " the finding that Agam failed to mitigate his damages. (*Sonic*, *supra*, 196 Cal.App.4th at p. 466.)

As noted above, the Gavras undermine their failure to mitigate argument by claiming elsewhere in their brief that Agam did not have the cash necessary to carry out the mitigation they contend was required. Regardless, their argument fails for other reasons. Agam testified that he did not pursue the $3.77 million loan, in part, because his partners were not willing to proceed with construction and might have prevented him from doing so by asserting their ownership interest in lot No. 3. That evidence, combined with evidence of the Gavras' vehement opposition to even discussing the subject of construction, supports the conclusion that it would have been unreasonable and impracticable for Agam to mitigate his damages by building a home on lot No. 3.[7]

## B. *The Gavras' Breach of Contract Claim*

The Gavras also challenge the trial court's refusal to enforce the Driscoll Agreement, a ruling premised on the theory that the agreement was procured by a breach of the Gavras' fiduciary duties to the partnership. The Gavras contend they did not breach their fiduciary duties in connection with the Driscoll Agreement, such that it is valid and enforceable.

As a threshold matter, we note the Gavras' do not dispute that an agreement procured by way of a fiduciary duty breach is unenforceable. However, neither they, nor Agam, cites to any authority for that proposition and we have found no case directly on

---

[7] We are unpersuaded by the Gavras' attempt to blame Agam for failing to inform them about Borel Bank's interest in a $3.77 million loan, which it expressed in a March 2010 letter. By that time, the Gavras (and their attorney) repeatedly had informed Agam they would not participate in construction and the parties were embroiled in litigation. Moreover, Eli had made clear he was unwilling even to engage in conversation related to construction, stating "[t]he only discussion we'll have from now on is on one and only one issue--dissolving the partnership or selling the lots."

22

point. At least two justifications for such a rule exist. First, illegal contracts are not enforceable. One type of illegal--and thus unenforceable--contract is "[a] promise by a fiduciary to violate his or her fiduciary duty, or one that tends to induce such a violation." (1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, § 454(b)(3)(d)(5), p. 497, citing Rest.2d Contracts, § 193.) It follows that a contract procured by a fiduciary duty breach likewise is illegal and unenforceable. Second, " 'partners are held to the standards and duties of a trustee in their dealings with each other.' " (*Enea v. Superior Court* (2005) 132 Cal.App.4th 1559, 1564 (*Enea*).) "[A] contract . . . entered into between a trustee and his beneficiary through which the former gains an inequitable advantage . . . is voidable at the election of the beneficiary." (*Estate of Berry* (1925) 195 Cal. 354, 362; *BGJ Associates v. Wilson* (2003) 113 Cal.App.4th 1217, 1229.) Under similar reasoning, a contract between partners that unfairly advantages one over the other might be deemed voidable by the disadvantaged partner. In any event, because the Gavras do not raise the issue on appeal, "[a]ny error has been waived." (*Stoll v. Shuff* (1994) 22 Cal.App.4th 22, 25, fn. 1.) Thus, we shall proceed on the premise that the Driscoll Agreement was unenforceable if, in negotiating it, the Gavras breached their fiduciary duties to their partners.

### *1.    Substantive Law and Standard of Review*

"The defining characteristic of a partnership is the combination of two or more persons to jointly conduct business. [Citation.] It is hornbook law that in forming such an arrangement the partners obligate themselves to share risks and benefits and to carry out the enterprise with . . . the loyalty and care of a fiduciary." (*Enea*, *supra*, 132 Cal.App.4th at p. 1564.) " 'Partnership is a fiduciary relationship, and partners are held to the standards and duties of a trustee in their dealings with each other. " ' "[I]n all proceedings connected with the conduct of the partnership every partner is bound to act in the highest good faith to his copartner and may not obtain any advantage over him in the partnership affairs by the slightest misrepresentation, concealment, threat or adverse

23

pressure of any kind." ' " ' " (*Ibid*.) "[A] partner who seeks a business advantage over another partner bears the burden of showing complete good faith and fairness to the other" (i.e., that the advantage was not procured by misrepresentation, concealment, threat or adverse pressure). (*Everest Investors 8 v. McNeil Partners* (2003) 114 Cal.App.4th 411, 424.)

"A partner does not violate [his or her fiduciary duties] merely because the partner's conduct furthers the partner's own interest." (Corp. Code, § 16404, subd. (e).) "The apparent purpose of this provision . . . is to excuse partners from accounting for incidental benefits obtained in the course of partnership activities *without detriment to the partnership*." (*Enea*, *supra*, 132 Cal.App.4th at p. 1566.)

Whether a fiduciary duty has been breached is a question of fact. (*Amtower v. Photon Dynamics*, *Inc*. (2008) 158 Cal.App.4th 1582, 1599.) Accordingly, we review the trial court's finding that the Gavras' breached their fiduciary duties for substantial evidence. (*Pellegrini v. Weiss* (2008) 165 Cal.App.4th 515, 524.) In determining whether substantial evidence, contradicted or uncontradicted, supports the court's finding, "we draw all reasonable inferences from the evidence to support the findings and orders of the [trial] court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." (*In re Heather A*. (1996) 52 Cal.App.4th 183, 193.)

> 2. *Substantial Evidence Supports the Finding That the Gavras*
> *Breached Their Fiduciary Duties*

There was substantial evidence before the trial court from which it could have found that the Gavras obtained an unfair advantage over their partners in the Driscoll Agreement.

The Driscoll Agreement called for the transfer of title to lot No. 2 from all of the partners to Agam and Cohen to secure the hard money loan. A related provision authorized the Gavras to record a deed transferring title back to all of the partners at their

24

"discretion, after considering any detrimental consequences to the partnership," "to protect [the] Gavra[s'] interest." Notably, while that provision required the Gavras to "consider[]" the impact of recording the deed on the partnership, it did not require them to defer to the interests of the partnership. To the contrary, it permitted them to allow their own interest to trump that of the partnership. As such, the provision constituted an unfair advantage in favor of the Gavras.

The trial court implicitly found that the Gavras did not carry their burden of showing that advantage was procured fairly and in good faith (not by misrepresentation, concealment, threat or adverse pressure). Uncontradicted evidence does not compel the opposite conclusion. (*Sonic*, *supra*, 196 Cal.App.4th at pp. 465-466.) Rather, the evidence shows the Gavras' procured the Driscoll Agreement using adverse pressure: Agam and Cohen testified that the Gavras threatened to allow the Driscoll Loan to go into default if Agam and Cohen did not agree to the Driscoll Agreement, which was negotiated and signed at the eleventh hour. The Gavras contend e-mails the partners exchanged in the days leading up to the signing of the Driscoll Agreement show Agam and Cohen agreed in principle to the agreement days in advance. Our review of those e-mails belies that characterization. A Thanksgiving Day e-mail from Eli to Tuck indicates that Agam and Cohen had, in Eli's view, "reject[ed] all the essence of the agreement proposed" by the Gavras. In that e-mail Eli threatened: "if an agreement won't be reach by Sun[day] night I will have to revoke my instruction to the title company." An e-mail from Cohen to Tuck the following day reflects the desperate mood of the partners immediately prior to the signing of the Driscoll Agreement. He wrote: "you are our only practical hope to save . . . lot #2 from a probable foreclosure, by trying to come up with a quick and simple agreement everybody can live with."

That Agam and Cohen knew all of the relevant facts before signing the Driscoll Agreement does not vindicate the Gavras, as they contend. For that argument, the Gavras' rely on *Skone v. Quanco Farms* (1968) 261 Cal.App.2d 237. There, the court

25

explained that a "partner who deals with partnership property" does not breach his or her fiduciary duties "if there has been a full and complete disclosure," meaning the partner "first discloses all of the facts surrounding the transaction to the other partners and secures their approval and consent." (*Id*. at p. 241.) We read *Skone* as recognizing that full and fair disclosure of all material facts is *one* prerequisite to a fiduciary duty compliant transaction. This court held as much in *Enea*. (*Enea*, *supra*, 132 Cal.App.4th at p. 1564 [in partnership-related transactions, partners may not obtain any advantage over copartners "by the slightest *misrepresentation*, *concealment*, threat or adverse pressure of any kind," quotations omitted, italics added].) But *Skone* does not stand for the proposition that disclosure is the *only* prerequisite. As this court noted in *Enea*, the absence of any threat or adverse pressure also is required. Here, the Gavras wielded such pressure, thereby violating their fiduciary duties. For the foregoing reasons, the trial court did not err in entering judgment in favor of Agam on the Gavras' breach of the Driscoll Agreement claim.

### C. *Attorney Fees*

Finally, the Gavras maintain the award of attorney fees in Agam's favor should be reversed if we reverse as to their breach of contract claim against Agam. Because we find the trial court did not err in connection with the Gavras' breach of contract claim, we likewise find no error in its award of attorney fees.

## III. DISPOSITION

The judgment is affirmed. Agam shall recover his costs on appeal.

26

_____
                                    Premo, J.




WE CONCUR:




_____
        Rushing, P.J.




_____
        Márquez, J.




Agam v. Gavra et al.
H038537; H039031

| | |
|---|---|
| Trial Court: | Santa Clara County Superior Court<br>Superior Court No. 1-09-CV143471 |
| Trial Judge: | Hon. Aaron Persky |
| Counsel for Defendants/Cross-complainants and Appellants:<br>Eliyahu Gavra, Yifah Gavra | Law Offices of Russell J. Hanlon<br>Russell J. Hanlon |
| Counsel for Plaintiff/Cross-defendant and Respondent:<br>Isaac Agam | Shea & McIntyre<br>Marc L. Shea<br><br>Myron Moskovitz |

Agam v. Gavra et al.
H038537; H039031