Filed 11/6/15  Garden Grove Galleria v. Cathay Bank CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

|  |  |
|---|---|
| GARDEN GROVE GALLERIA, LLC, | |
| Plaintiff, Cross-defendant and Appellant, | G050394 (Consol. with G051021) |
| v. | (Super. Ct. No. 30-2010-00342212) |
| CATHAY BANK, | O P I N I O N |
| Defendant, Cross-complainant and Appellant; | |
| THEODORE C. YOON et al., | |
| Cross-defendants and Respondents. | |

Appeals from a judgment and a postjudgment order of the Superior Court of Orange County, Ronald L. Bauer, Judge.  Judgment and postjudgment order affirmed.

Miller Barondess, Louis R. Miller, Daniel S. Miller and Mira Hashmall; Frandzel Robins Bloom & Csato, Thomas M. Robins and Steven N. Bloom for Defendant, Cross-complainant and Appellant Cathay Bank.

Lowe & Baik, Jeffre T. Lowe and John A.S. Baik for Plaintiff, Cross-defendant, and Appellant Garden Grove Galleria, LLC, and Cross-defendants and Respondents Theodore C. Yoon, Julie Yoon, Charles H. Kim and Mok Kim.

\*          \*          \*

This case involves two appeals consolidated for decision.  In case No. G050394 Cathay Bank (Cathay) appeals from a judgment in favor of Garden Grove Galleria, LLC (GGG) on the latter's complaint for breach of contract and in favor of GGG, Theodore C. Yoon, Julie Yoon, Charles H. Kim, and Mok Kim on Cathay's cross-complaint for breach of personal guaranties and judicial foreclosure.  In case No. G051021, GGG appeals from a postjudgment order denying its motion for attorney fees and granting Cathay's request to strike costs.  We find the contentions asserted by each appellant lack merit and affirm both the judgment and the postjudgment order.

CASE No. G050394

*1. Facts and Procedural Background*

The Yoons and the Kims created GGG to build a multi-story mixed use development on vacant land owned by a third party.  In 2003, Theodore C. Yoon and Charles H. Kim acquired possession of the land under a long-term lease.  Over the next several years, they obtained plans for the development, hired a contractor, and acquired the city permits necessary to proceed with the proposed development.

In late 2007, GGG and Cathay entered into a $42.5 million construction loan agreement (CLA) to build the proposed development.  To obtain the loan, GGG made a required "Minimum Equity" deposit of $10,625,000 that consisted of $7,164,330 in prior development expenditures plus an additional payment of $3,460,670.  GGG also

2

signed a promissory note secured by a deed of trust recorded on its leasehold interest in the parcel. Theodore C. Yoon, Julie Yoon, Charles H. Kim, and Mok Kim signed personal guaranties for the CLA.

Due to delays in obtaining approval from participating lenders, East West Bank and Wing Lung Bank, the loan was not funded until December 2007. GGG presented evidence that both parties understood construction of the development would take two years. But the CLA specified the construction's completion date as December 12, 2008, and a loan maturity of May 1, 2009, with the option of three 90-day extensions.

Section 3.13 of the CLA listed several conditions that had to be met to trigger Cathay's obligation to disburse construction funds. These conditions included requirements that GGG submit and document written applications for payment through Chuck Hasz Enterprises, Inc. (Hasz), Cathay's fund control manager. In part, section 3.13.24 stated: "Lender or Fund Control may, at any time and from time to time, cause an inspection to be made of the progress of the construction. If any such inspection shows that the construction has reached a stage consistent with the work and materials represented in the Application for Payment to have been incorporated into the work of improvement, and upon the occurrence of all other conditions set forth in this Section 3.13, Lender will make Disbursements in accordance with this Agreement."

In addition, section 3.13.18 declared "the total amount of the Project Funds on hand shall be sufficient, in the sole opinion and judgment of Lender, to complete the Improvements." It also required GGG (1) to "immediately pay any and all cost overruns in excess of the Contingency Reserve," plus (2) on written notice, "Deposit . . . an amount equal to [any] deficiency" if Cathay determines "the total of Project Funds shall be insufficient . . . to complete the Project, or be less than the Project Costs . . . ."

According to plaintiffs' testimony the development's construction proceeded smoothly for the first several months. In December 2008, Cathay informed GGG that East West Bank, one of the participating lenders, had begun "aggressively

3

managing its [real estate] loans . . . to reduce its exposure." The same month payment of disbursement request No. 15 was delayed until January 2009. Cathay claimed East West Bank caused the delay because it erroneously believed GGG had not paid real property taxes. Due to the delay in payment, work on the project ceased.

GGG presented evidence of further delays in the payment of subsequent disbursement requests, which caused further work stoppages. Cathay denied there were disbursement delays and any lag in payment resulted from GGG's and its general contractor's failure to properly document their funding requests.

In March 2009, Cathay demanded GGG make an additional $1 million deposit, declaring it would not continue funding the project without more funds. The demand resulted from Cathay's insistence on maintaining a relative balance between the estimated costs Hasz had budgeted for each category of labor, service, or construction materials needed to complete the development and the sums actually disbursed for these line items. Cathay also claimed the percentage of disbursements from the CLA's contingency reserve needed to match the project's estimated completion status. To satisfy Cathay's demand, GGG provided it with a $1 million stand-by letter of credit.

In early April 2009, the parties began discussing the necessity of extending the CLA. On the morning of May 29, 2009, Cathay sent GGG an e-mail with two attached documents: (1) a 3-page amendment to the CLA declaring the project's completion date was December 1, 2009; and (2) a 9-page loan extension agreement that specified the loan maturity date would be February 1, 2010. The e-mail also demanded GGG pay renewal fees of $202,100. Both of the documents were dated April 27, 2009. The e-mail insisted GGG's principals and guarantors sign the documents and return them to Cathay by 1:00 p.m. the same day. Theodore C. Yoon spoke to a Cathay vice-president by telephone asking for additional time to review the documents. But he was told that without the signed documents, "this deal is gone." GGG's principals and guarantors signed the documents and sent them to Cathay.

4

The loan extension agreement contained a clause whereby GGG and its guarantors relieved Cathay "from any and all claims . . . which Borrower and Guarantor . . . now own or hold . . . by reason of any acts, facts, transactions or any circumstances whatsoever occurring or existing through the date of this Extension, including . . . those based upon, arising out of, appertaining to, or in connection with . . . the Loan, the Loan Documents, [or] the facts pertaining to this Extension."

In late May, GGG also submitted disbursement request No. 20. Hasz approved the nearly $2.1 million request, but Cathay declined to fund nearly $1.2 million requested for the purchase of concrete and steel, asserting there was an imbalance between the percentage of the funds allocated to these budget items and the amounts sought for the materials. Cathay also did not want to use the loan's contingency reserve because the percentage of it already used exceeded the percentage of the project's completion. GGG presented evidence that had Cathay approved disbursement request No. 20's funding for concrete and steel, there still would have been over $785,000 of funds budgeted for concrete and over $580,000 budgeted for steel. In addition, the evidence showed the loan's contingency reserve still had over $1 million.

Again, work on the project ceased. At this point, Cathay refused to fund any further disbursement requests unless GGG deposited an additional $1 million into the project. In August, GGG agreed to do so. It immediately deposited $600,000 in cash, added an additional $50,000 in early September, and promised to fund the balance by the end of the year. Cathay then paid the balance of disbursement request No. 20.

GGG submitted disbursement request No. 21 on August 25. It was approved October 7. Disbursement request No. 22 was submitted to Hasz on November 5 and it approved the request on November 12.

Cathay refused to honor disbursement request No. 22 and declared GGG was in default under the loan. The reasons given for this decision were that GGG had

failed to timely complete construction of the project, and an appraisal Cathay had requested in early December showed the value of the project was under water.

GGG sued Cathay for breach of contract. Cathay cross-complained against GGG for judicial foreclosure and against the Yoons and the Kims for breach of the personal guaranties. A jury trial was held on the legal issues.

At trial, Cathay's appraiser estimated the project's value in its current condition at less than the approximately $19.3 million loan proceeds previously disbursed. Further, even if completed, he concluded the project's value would be less than the total of project funds. GGG presented the testimony of a licensed real estate broker and principal in a business that operates commercial property. He opined that if GGG retained ownership of the project and leased its residential units and commercial spaces, it could generate a gross annual income of approximately $4.6 million.

The jury returned verdicts for GGG on the complaint, awarding it damages of $11,275,000. On Cathay's cross-complaint, the jury found in favor of the Yoons and the Kims on the breach of the personal guaranties cause of action, finding GGG did not breach the CLA and promissory note.

In a subsequent trial on Cathay's equitable cause of action for judicial foreclosure, the trial court ruled for GGG, citing the jury's verdict against Cathay on the cross-complaint. It thereafter entered judgment for plaintiff and cross-defendants and also denied Cathay's motion for new trial.

2. *The Evidentiary Claims*

Cathay challenges the validity of the trial court's judgment on several grounds.

First, Cathay attacks the jury's verdict finding that it breached the CLA, while also deciding GGG did not do so. The question of whether a contracting party's conduct amounts to a material breach presents a question of fact. (*Plotnik v. Meihaus*

6

(2012) 208 Cal.App.4th 1590, 1602-1603.)  We conclude Cathay's failure to provide a complete and documented summary of the evidence presented at trial results in a waiver of these arguments.

"A judgment or order of a lower court is presumed to be correct on appeal, and all intendments and presumptions are indulged in favor of its correctness."  (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133.)  When an appellant attacks the trier of fact's findings "'a reviewing court starts with the presumption that the record contains evidence to sustain every finding of fact,'" and is limited to determining "'whether there is any substantial evidence contradicted or uncontradicted which will support the finding of fact.'"  (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881.)  "To prevail on a substantial evidence claim a party must '"set forth in [its] brief all the material evidence on the point and not merely [its] own evidence,"'" and must "support evidentiary claims with accurate record references."  (*Provost v. Regents of University of California* (2011) 201 Cal.App.4th 1289, 1304.)  The "failure to comply with these requirements forfeits this claim."  (*Id.* at p. 1305; *Foreman & Clark Corp. v. Fallon, supra,* 3 Cal.3d at p. 881 [appellant's "recitation of only [its] evidence is not the 'demonstration' contemplated under the above rule" and its evidentiary sufficiency challenge "'is deemed to be waived'"].)

By focusing on the evidence favoring itself, Cathay's brief fails to provide a fair statement of all the relevant evidence.  That is especially true here given the extraordinary size of the appellate record.  It consists of a clerk's transcript exceeding 6600 pages, a reporter's transcript of over 1000 pages, an appendix augmenting the record with over 1400 pages, plus two boxes containing numerous trial exhibits. "Professional ethics and considerations of credibility in advocacy require that appellants support their arguments with fair and accurate representations of trial court proceedings" (*Myers v. Trendwest Resorts, Inc.* (2009) 178 Cal.App.4th 735, 745), and "'the burden to

7

provide a fair summary of the evidence "grows with the complexity of the record."'" (*Id.* at p. 739.)

Further, an "'appellate court is not required to search the record on its own seeking error.'" (*Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1246.) Thus, ["'[i]f a party fails to support an argument with the necessary citations to the record, . . . the argument [will be] deemed to have been waived.'" (*Ibid.*) As GGG points out, Cathay's opening brief begins with an eight-page summary of the evidence that not only presents the facts in a manner favorable to its cause, but fails to provide any citation to the record. This approach was inappropriate. (Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2014) ¶ 9:36, p. 9-12 ["Any statement in a brief concerning matters in the appellate record—whether factual or procedural and no matter where in the brief the reference to the record occurs—*must be supported by a citation to the record*"].) To further complicate matters, while the opening brief's statement of facts does contain record references, the bulk of them are to excerpts of the trial record submitted as exhibits in support of Cathay's new trial motion rather than the trial record itself.

Under these circumstances, we conclude Cathay forfeited any claim that the evidence fails to support the jury's findings on the issue of breach.

*3. Interpretation of the CLA*

Throughout its opening brief, Cathay contends that, to be entitled to a disbursement of funds, the CLA obligated GGG to "certify . . . a line item in the construction budget [wa]s not paid in excess of its completion status." Cathay also repeats its claim that approval of reallocations from the contingency reserve required "the percentage of remaining contingency funds match[] the percentage of project completion." We reject Cathay's interpretation of the parties' obligations under the CLA.

"'The fundamental rules of contract interpretation are based on the premise that the interpretation of a contract must give effect to the "mutual intention" of the

8

parties. "Under statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs interpretation. (Civ. Code, § 1636.) Such intent is to be inferred, if possible, solely from the written provisions of the contract. (*Id.*, § 1639.) The 'clear and explicit' meaning of these provisions, interpreted in their 'ordinary and popular sense,' unless 'used by the parties in a technical sense or a special meaning is given to them by usage' (*id.*, § 1644), controls judicial interpretation. (*Id.*, § 1638.)'"" (*U.S. Bank National Assn. v. Yashouafar* (2014) 232 Cal.App.4th 639, 646, quoting *Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 18.) "We consider the contract as a whole and interpret its language in context so as to give effect to each provision, rather than interpret contractual language in isolation. ([Civ. Code,] § 1641.)" (*Windsor Pacific LLC v. Samwood Co., Inc.* (2013) 213 Cal.App.4th 263, 274.)

As GGG notes, the 52-page CLA drafted by Cathay does not contain any provision expressly supporting Cathay's interpretation of the agreement. In fact, sections 3.13.18 and 4.13.1 conflict with Cathay's interpretation of the CLA. Section 3.13.18 required GGG to "immediately pay any and all cost overruns in excess of the Contingency Reserve," and, if "at any time" Cathay concluded "the total of Project Funds shall be insufficient . . . to complete the Project, or be less than the Project Costs," it could, on 10 days notice, "demand" GGG make "an additional . . . Deposit in an amount equal to such deficiency." Section 4.13.1's reinforced the latter additional deposit requirement, obligating GGG to inject funds if Cathay determined "the Undisbursed Project Funds, after deduction of amounts theretofore paid out . . ., is less than the estimated amount required to fully complete and pay for the Project."

Cathay relies on five sections of the CLA. None of them support its position. Section 2.18 simply recited GGG's representation that "[t]he Project can be completed at a total cost not exceeding the Project Funds, and [it] will complete the Project at a total cost equal to or less than the Project Funds, free of liens, not later than the Completion Date." Section 3.13.18, in addition to obligating GGG to inject

9

additional funds into the project under the conditions mentioned above, required GGG to produce "[e]vidence that the total amount of the Project Funds on hand shall be sufficient, in the sole opinion and judgment of Lender, to complete the Improvements free of liens and to pay interest and other sums as and when due under the Loan Documents." The third section, 4.13.1, as discussed above merely reinforced GGG's obligation to deposit additional funds if Cathay concludes "the Undisbursed Project Funds" are insufficient "to fully complete and pay for the Project."

The contract defined the phrase, "Project Funds," to include the $42.5 million "Construction Loan Proceeds plus Borrower's [$10.625 million] Deposit," a total sum of nearly $53 million. There was evidence that before Cathay stopped funding the project, GGG had completed over 50 percent of the work, but had only spent $19.3 million of the loan funds. The evidence also supported a conclusion the contingency reserve never fell below $1 million. And Cathay never gave GGG written notice that it had determined "the total of Project Funds [were] insufficient . . . to complete the Project, or [were] less than the Project Costs."

A fourth section Cathay cites is section 2.23. But it merely contains GGG's representation that it was and would remain solvent. There was no evidence that GGG had become insolvent before Cathay stopped funding the project.

Finally, Cathay places heavy reliance on the last two sentences of section 3.13.24 of the CLA. This clause conditioned the disbursement of loan funds on compliance with certain requirements, including: "Lender or Fund Control may, at any time and from time to time, cause an inspection to be made of the progress of the construction," and "[i]f any such inspection shows that the construction has reached a stage consistent with the work and materials represented in the Application for Payment to have been incorporated into the work of improvement, and upon the occurrence of all other conditions set forth in this Section 3.13, Lender will make Disbursements in accordance with this Agreement."

10

Nothing in section 3.13.24 imposed a requirement that either the percentage of the loan funds disbursed or the percentage of the remaining contingency reserve match the percentage of the work completed on the project. Section 3.13.24's last two sentences merely obligated GGG to show it had completed the portion of the work described in the disbursement request before it would be entitled to receive payment.

In its opening brief, Cathay appears to rely on a fund control agreement the parties executed along with and incorporated into the CLA to support its line-item balancing requirement. In interpreting a contract, "Several contracts relating to the same matters, between the same parties, and made as parts of substantially one transaction, are to be taken together." (Civ. Code, § 1642.) But the only fund control documents signed by GGG found in the appellate record are an introductory letter from Hasz that one of GGG's principals signed acknowledging he had read and understood it, and a one-page document describing Hasz's disbursement procedures. Neither document contains an express line item balancing requirement.

The spreadsheets employed by Hasz did contain columns that specified the percentage of funds disbursed and its estimate of the percentage of work completed for each budgeted item, including the contingency reserve. Hasz's owner testified that, at least as to a project's contingency reserve, the policy of most lenders was to maintain a balance between the percentage of funds expended and the estimated percentage of the project's completion.

"Stipulations which are necessary to make a contract reasonable, or conformable to usage, are implied, in respect to matters concerning which the contract manifests no contrary intention." (Civ. Code, § 1655.) But sections 3.13.18 and 4.13.1, required GGG to deposit additional monies into the project if Cathay notified GGG that the remaining loan funds are insufficient to cover the project's outstanding costs. Section 3.13.18 also obligated GGG to "immediately pay any and all cost overruns in excess of the Contingency Reserve." These clauses conflict with an implied construction loan

11

industry custom that disbursements from a budget's individual line items not exceed the project's completion status. (*Andrews v. Waldo* (1928) 205 Cal. 764, 770 ["It may not be disputed that parties who contract as to a subject matter concerning which known usages prevail, incorporate such usages into their agreements by implication," however, "stipulations . . . necessary to make a contract conformable to usage are implied only in respect to matters concerning which the contract manifests no contrary intention"].) Thus, Cathay cannot rely on standard practice in the construction loan industry to support its theory that the CLA required a balance between the percentage of the work completed and a percentage of the loan funds disbursed.

We conclude Cathay's interpretation of the CLA as requiring line item balancing lacks merit.

*4. The Loan Extension Agreement's Release Clause*

The loan extension agreement signed by GGG on May 29, 2009, contained a general release clause relieving Cathay "from any and all claims" GGG or the guarantors might "now own or hold" against it "by reason of any acts, facts, transactions or any circumstances whatsoever occurring or existing through the date of this Extension." At trial, Cathay submitted special instruction No. 4, which stated: "The court has found as a matter of law and instructs you to find that [GGG] may not base any of its claims on any act or conduct of or chargeable to Cathay . . . that occurred prior to the date [GGG] executed the Extension Agreement." The court declined to give this instruction.

Cathay contends that during trial, the court declared the loan extension agreement, which contained the release clause, was enforceable. Thus, the court committed reversible error by refusing to give special instruction No. 4, barring the jury from relying on its conduct prior to the execution of the loan extension agreement to

12

support GGG's breach of contract cause of action. We conclude the record fails to support a conclusion the trial court's failure to given this instruction prejudiced Cathay.

First, the record reference Cathay provides for the trial court's purported enforceable loan extension agreement ruling does not support its claim the trial court ruled on that document's enforceability. The portion of the record cited concerned the court's decision on an unrelated matter; plaintiffs' motion to reform the CLA. In that request, plaintiffs asked the court to correct the dates for completing construction and loan maturity contained in the CLA. The CLA initially provided for a completion date of December 12, 2008 and a loan maturity date of May 1, 2009. Plaintiffs argued the court should reform the CLA to declare a construction completion date of December 1, 2009 and a loan maturity date of May 1, 2010. The trial court "den[ied] the request for any reformation." The court was not asked to nor did it rule on the loan extension agreement's enforceability.

Second, as GGG notes, the evidence concerning whether there were delays in payment of pre-loan extension agreement disbursement requests and what caused the delays was relevant to Cathay's cross-complaint which sought recovery from the guarantors on the basis that GGG had breached the CLA. Further, the appellate record reflects the case largely focused on what happened after GGG signed the loan extension agreement, and that neither the enforceability nor the importance of the loan extension agreement's release clause was seriously contested at trial.

In his opening statement, GGG's counsel mentioned Cathay had inserted "a nice big fat juicy release . . . in" the loan extension agreement, but asserted "the breaches by Cathay Bank would get worse after the extension agreement. That's when things really got bad." Cathay's attorney responded, "not one time from the date they signed [the loan extension agreement] until after this lawsuit was filed . . . did anybody complain about any of the terms, . . . saying, gee whiz, we now see there is a release clause in here . . . that we didn't agree to or anything else. What they did is they accepted

13

another four-plus million dollars worth of funding . . . without one word of protest whatsoever."

During trial, GGG's principal who managed the development testified he did not read the loan extension agreement. But he admitted all of the principals signed the document and initialed each page. The witness further testified that "the biggest delays [occurred] after [GGG signed] the extension agreement."

In closing argument, GGG's counsel repeated the theme that what occurred after the loan extension agreement was signed constituted a "total[] and complete[] . . . material breach" of the CLA. Counsel stated, "[I]n the extension agreement is a full release releasing the bank from any and all liability for everything that had come up to that point. . . . [¶] I think the bank at that point decided they were . . . in a much better position because, truthfully, after May 29th, 2009, that's when things really got bad. And, essentially, right after this, it almost is over, because the very next draw is the end of everything, in essence." Thereafter, on no less than four occasions, GGG's attorney argued "draw request 20 basically to me is the case, is the battleground." At a later point, counsel cited Cathay's e-mail refusing to fully fund disbursement No. 20, and asserted: "And, again, this is it. This was the end of everything because what the bank chose to do at the end of June . . . . [¶] . . . [¶] . . . The bank said, no, we're not funding. This is breach of contract right there, right then. This was a material breach. This went to the core of the very purpose of this contract. This was the essence of the contract. Once they did this, that was the end of it. I mean, really, from this point forward, it was finished."

Cathay's attorney argued the pre-loan extension delays were short and largely resulted from GGG's and its contractor's failure to properly document the disbursement requests. Discussing the loan extension agreement's contents, including the release clause, counsel stated: "There is no instruction that this court is going to give you that any of those terms and conditions are unenforceable or anything like that. Every

14

single term of the extension agreement . . . is enforceable in accordance with its terms, including the . . . release. [¶] And I don't even think you need to consider the release because we didn't do anything wrong, but it's there and they can't get away from it."

Third, while the court declined to give Cathay's special instruction No. 4, it did give other instructions proposed by Cathay informing the jury of its claim the release clause barred reliance on the pre-loan extension delays. "In reviewing instructions, the appellate court must read the charge as a whole and give the instructions a reasonable construction from the standpoint of their probable effect upon the jury." (*Wells v. Lloyd* (1942) 21 Cal.2d 452, 458; *Gordon v. Aztec Brewing Co.* (1949) 33 Cal.2d 514, 519.) Thus, "In instructing a jury it is sufficient if the court gives a well balanced statement of the essential legal principles necessary to guide them in their deliberations, and when that is done a party is not prejudiced by refusal to give an additional instruction merely because it may be said to be applicable to the case from the viewpoint of the party offering it." (*Cucamonga County Water Dist. v. Southwest Water Co.* (1971) 22 Cal.App.3d 245, 266.)

Special instruction No. 8, which summarized Cathay's theory of the case included its assertion that GGG "contractually released any purported claims that may have arisen prior to the date it executed the Extension Agreement on May 29, 2009." Special instruction No. 6, also proposed by Cathay, addressed the issue of waiver. It defined what constituted a waiver and stated: "Cathay Bank claims that Garden Grove Galleria waived any right to claim a default under the loan as a result of any claimed delay in paying Disbursement Requests for which it ultimately made payment and which payments were accepted by Garden Grove Galleria." Finally, Cathay's special instruction No. 2 informed the jury that "[a]t no time was Cathay Bank obligated to waive any of the terms and conditions of the loan documents."

Finally, even assuming the court erred in failing to give special instruction No. 4, Cathay was not prejudiced by its absence. "A party is entitled upon request to

15

correct, nonargumentative instructions on every theory of the case advanced by him which is supported by substantial evidence. The trial court may not force the litigant to rely on abstract generalities, but must instruct in specific terms that relate the party's theory to the particular case." (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 572 (*Soule*) .) Generally, we "independently review a claim of instructional error." (*Holguin v. Dish Network LLC* (2014) 229 Cal.App.4th 1310, 1319.)

In *Soule*, the Supreme Court disapproved of "a substantial body of California decisions" that had held "the erroneous denial of correct specific instructions covering a civil litigant's supportable 'theory of the case' is 'inherently' prejudicial" (*Soule, supra,* 8 Cal.4th at p. 574), and "conclude[d] that there is no rule of automatic reversal or 'inherent' prejudice applicable to any category of civil instructional error, whether of commission or omission" (*id.* at p. 580). Thus, "A judgment may not be reversed for instructional error in a civil case 'unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice.' (Cal. Const., art. VI, § 13.)" (*Ibid*.)

*Soule* further explained, "Instructional error in a civil case is prejudicial 'where it seems probable' that the error 'prejudicially affected the verdict.' . . . Of course, that determination depends heavily on the particular nature of the error, including its natural and probable effect on a party's ability to place his full case before the jury." (*Soule v. General Motors Corp., supra,* 8 Cal.4th at p. 580.) Consequently, "Actual prejudice must be assessed in the context of the individual trial record" (*ibid*.), and "when deciding whether an error of instructional omission was prejudicial, the court must also evaluate (1) the state of the evidence, (2) the effect of other instructions, (3) the effect of counsel's arguments, and (4) any indications by the jury itself that it was misled." (*Id.* at pp. 580-581, fn. omitted.)

Given the foregoing summary of the trial evidence, the instructions that were given, the focus of counsels' closing arguments, and the lack of any showing the

16

jury was confused or misled on the nature of the loan extension agreement's release clause, we conclude Cathay's claim the trial court committed prejudicial error by refusing to give its special instruction No. 4 lacks merit.

5. *Damages*

Next, Cathay attacks the damages awarded to GGG. The court instructed the jury on GGG's damages theory using CACI No. 350 [Introduction to Contract Damages]. In part, the instruction stated: "Plaintiff Garden Grove Galleria, LLC claims damages for all monies it spent toward performance of the Construction Loan Agreement. Those damages are: [¶] $10,625,000 for monies initially spent by Plaintiff on the Garden Grove Galleria Project which was credited by Cathay Bank as Garden Grove Galleria's minimum equity; [¶] $650,000.00 for additional cash Garden Grove Galleria deposited into its construction project in 2009." The jury awarded GGG the combined total of these amounts; $11,275,000.

Cathay contends the award is excessive for three reasons: (1) it includes expenditures made by GGG before the parties entered into the CLA; (2) there was no offset for the losses GGG would have incurred had the parties fully performed the contract; and (3) the verdict form used by the trial court was defective. Again, we find no merit in these contentions.

GGG sought recovery of reliance damages. "One proper 'measure of damages for breach of contract is the amount expended [by the nonbreaching party] on the faith of the contract.' . . . That the nonbreaching party's damages include his or her 'outlay incurred in making preparations for the contract' has been the law in California for over a century." (*Agam v. Gavra* (2015) 236 Cal.App.4th 91, 105.)

Cathay argues the damage award is excessive because it includes the $7.1 million GGG incurred before the parties entered into the CLA, and thus GGG did not incur those expenses in reliance on the agreement. But as GGG notes the CLA expressly

17

required it to make a "Minimum Equity" deposit to obtain Cathay's agreement to fund the loan. The "Minimum Equity" deposit specified in the CLA was $10,625,000, which included the $7.1 million GGG had previously expended on the project. Consequently, while GGG incurred the $7.1 million in expenses before the parties entered into the CLA, that agreement required GGG to use its prior expenditures as part of its equity deposit to obtain the $42.5 million construction loan.

Cathay also contends the damage award was excessive because "[t]he CLA was a losing contract." It argues "it would have cost GGG" over $53 million "to complete the Project," and since that amount far exceeded the jury's award, "GGG suffered no damages." *Agam v. Gavra, supra,* 236 Cal.App.4th 91 held that a party's right to recover reliance damages should be limited where there is "proof that the plaintiff would have suffered a loss even if the defendant had fully performed." (*Id.* at p. 106.) "Thus, much like courts allow the breaching party to prove the nonbreaching party's expenditures were unnecessary, courts allow the breaching party 'to reduce [the nonbreaching party's recovery] by as much as he can show that the [nonbreaching party] would have lost, if the contract had been performed.'" (*Ibid.*) But *Agam* further held "in the context of reliance damages," once the plaintiff establishes "the amount [it] expended in reliance on the contract," "[t]he burden then shifts to the defendant to show . . . how much the plaintiff would have lost had the defendant fully performed (i.e., absent the breach)." (*Id.* at p. 107.)

Here, the court's damages instruction told the jury: "The purpose of such damages is to put plaintiff Garden Grove Galleria, LLC in as good a position as it would have been if defendant Cathay Bank had performed as promised." And, the parties presented conflicting evidence on whether the CLA was a "losing contract." GGG's real estate expert testified that if GGG retained ownership of the project after completion and leased both the residential and commercial units it could receive $4.6 million in annual gross income. Cathay argues the fact that GGG did not intend to sell the property, "is not

18

the standard for determining reliance damages under a losing contract." But Cathay cites no authority for this proposition. "The inquiry on appeal is whether the determination of damages is supported by substantial evidence, and the appellant has the burden of demonstrating error in the determination." (*Johnson v. Cayman Development Co.* (1980) 108 Cal.App.3d 977, 983.) As discussed above, Cathay's failure to comply with the requirement that it provide a fair summary of all relevant evidence presented at trial, also results in forfeiture of its excessive damage claim.

Finally, Cathay attacks the special verdict form used by the court for GGG's breach of contract claim. Paragraph 7 stated: "What are plaintiff Garden Grove Galleria, LLC's damages? [¶] All sums expended by Plaintiff toward performance of the contract . . . $_____" (Some capitalization omitted.) On the blank line the jury inserted the figure of "11,275,000." Cathay argues this form "made the judge an advocate for the plaintiff," because it "was tantamount to the trial court endorsing GGG's damages theory" and "instructed the jury to plug in a predetermined number advocated by GGG, rather than weigh the evidence and decide the issue of damages for itself."

This argument ignores the nature of this case. GGG argued Cathay's delay in disbursing funds and ultimate refusal to continue funding the project was the reason why it was prevented from timely completing the project. "'Where, without fault on his part, one party to a contract who is willing to perform it is prevented from doing so by the other party, the primary measure of damages is the amount of his loss, which may consist of his reasonable outlay or expenditure toward performance, and the anticipated profits which he would have derived from performance.'" (*Buxbom v. Smith* (1944) 23 Cal.2d 535, 541; *Parlour Enterprises, Inc. v. Kirin Group, Inc.* (2007) 152 Cal.App.4th 281, 294.) GGG limited its damages theory to the first category; the expenses it incurred toward performance of the project. Thus, it was not necessary to ask the jury to consider awarding damages for other categories of losses.

19

GGG also notes the verdict form used came from the Judicial Council's approved civil jury instructions. The form's use instruction notes a "breakdown" of the items of damages "is optional depending on the circumstances." (Judicial Council of Cal. Civ. Jury Instns. (2015) CACI No. VF-300.) Given the limited scope of GGG's damages theory, it was unnecessary to include in the verdict form the list of all potential types of damages available in a contract breach action.

We conclude the jury's award of damages to GGG on its contract claim is supported by both the law and the evidence.

*6. Judicial Foreclosure*

The court conducted a separate trial on Cathay's equitable judicial foreclosure cause of action. During the hearing, Cathay represented that it had cured GGG's default on the ground lease and had the lease reinstated so that it could obtain a deficiency judgment. The trial court ruled against Cathay. In its statement of decision the court explained that granting Cathay equitable relief would be "inconsistent with the finding by the jury—that GGG did not breach its contract with Cathay Bank. It is *axiomatic* to state that there can be <u>no</u> remedy if there is <u>no</u> breach."

On appeal, Cathay does not challenge the correctness of the trial court's reasoning. (*Hoopes v. Dolan* (2008) 168 Cal.App.4th 146, 157, 158 ["a jury's determination of legal issues may curtail or foreclose equitable issues" and thus, "[w]here legal claims are first tried by a jury and equitable claims later tried by a judge, the trial court must follow the jury's factual determinations on common issues of fact"].) It merely contends "the jury's finding during phase one of the trial that GGG did not breach the CLA is not supported by substantial evidence." Since we have concluded Cathay waived its right to challenge the evidentiary sufficiency supporting the jury's verdicts, we also reject Cathay's attack on the trial court's rejection of its judicial foreclosure cause of action.

20

*1. Background*

GGG filed a motion to recover nearly $1.3 million in attorney fees, relying on a clause in the CLA that entitled Cathay to recover its "costs and expenses . . . in connection with the enforcement of the Agreement and any other Loan Document and any matter related thereto, including the fees and out-of-pocket expenses of any legal counsel, . . . and other outside experts retained" and Civil Code section 1717. GGG also submitted a memorandum of costs requesting over $74,800 in costs.

The attorney fee motion was supported by a declaration from attorney Jeffre T. Lowe. According to the declaration, Lowe and his partner Jon A.S. Baik spent over 2,000 hours over the preceding five years on the case. Attached to the declaration as exhibit 2 was a document dated July 31, 2014 and addressed to GGG that summarized the firm's billings for services from January 2010 to the date of the motion. Lowe's declaration described the document as a "[a] true and correct copy of Lowe & Baik's invoices to Plaintiff for its legal fees." The document consists of 57 pages with columns and entries for the dates services were performed, the attorney performing the services, the time spent, a description of the work, and the amount charged. The last page noted Lowe had charged GGG at an hourly rate of $650, while Baik charged GGG at an hourly rate of $595.

Cathay opposed both the fee motion and costs request. It argued the fee motion "should be denied" or the amount "significantly reduced" because it was "unsubstantiated and inflated—and particularly because GGG was not forthright with the Court regarding the nature of the work for which it seeks compensation."

According to Cathay's opposition, "the bills for which GGG seeks reimbursement encompass far more than time spent on the 'instant case.' GGG has submitted time billed on numerous matters, including work done for disputes with its

21

contractors, fights with its landlord and other general legal matters on which it has sought advice over the years. . . . [¶] Worse, GGG improperly billed its time. It submitted blockbilling *for entire months and weeks—i.e.*, one billing entry and description for an entire month's worth of work. [¶] Moreover, to support the hourly rates for its attorney— ranging from $595-$650 an hour—GGG asks this Court to rely on nothing more than the *ipse dixit* of its own counsel regarding what is reasonable."

At the initial hearing, Lowe agreed to testify about the fee documentation under oath. He admitted exhibit 2 did not contain the firm's actual billings, and was never sent to GGG. Lowe described it as a consolidation of bills created "for sake of brevity" in presenting the motion. He also acknowledged the firm only billed GGG in 2010 and 2011. It stopped doing so because GGG could not pay. Lowe stated he "create[d] . . . billing records" for 2012, 2013, and 2014 "[i]n preparation for this motion." Lowe agreed to send copies of the 2010 and 2011 billing records to the court and opposing counsel. The matter was then continued to a later date.

The billing records sent to the court indicated that during 2010 and 2011 the firm billed GGG at the rate of $425 an hour. The total amount billed was $219,747.91. At the next hearing, Lowe acknowledged his initial declaration in support of the fee motion contained errors, but claimed that was due to the fact he "used a declaration from a prior motion."

The court denied the motion for attorney fees, citing "the nature of the misrepresentations in the motion," plus the "several inflation aspects" and "inaccuracies." Specifically, the court noted: (1) "the misrepresentations under penalty of perjury that were presented to the court"; (2) since Baik, while present at trial, "was essentially a nonparticipant[,] . . . the billing of his time at 10 hours . . . for day after day of trial is a serious inflation"; (3) "charges for events that are not the responsibility of the defendant," including "other actions, other problems, mechanic's liens, other events,) . . . simply not properly included here"; (4) "the billing rate was misrepresented"; (5) "[t]he records that

22

were presented were not contemporaneous" and "[t]here can be no doubt that these bills are a product of guess work"; and (6) "block billing" for "days in which hours of time are ascribed to many, many different events," rendering "the court unable to know what the events were, and what time was allocated to . . . events."  As for Lowe's assertion he had used the declaration from a prior case, the court stated, "Bluntly, I don't believe it."

The court also granted Cathay's motion to tax costs, reducing the amounts requested in several categories.  One reduction, for $27,064.42, concerned fees charged by GGG's expert witnesses.

## 2.  *The Denial of GGG's Attorney Fee Motion*

"Whether attorney fees may be awarded is a question of law, which we review de novo.  [Citation.]  We review the amount of attorney fees awarded for abuse of discretion."  (*Dzwonkowski v. Spinella* (2011) 200 Cal.App.4th 930, 934.)

There is no dispute that a party prevailing in an action on a contract that contains an attorney fee clause "shall be entitled to reasonable attorney's fees."  (Civ. Code, § 1717, subd. (a).)  GGG clearly prevailed in this matter, having succeeded in obtaining a damage award against Cathay on the CLA while Cathay lost on its cross-complaint based on a jury finding that GGG did not breach the parties' agreement.

But as Civil Code section 1717, subdivision (a) provides, a party is only entitled to "*reasonable* attorney's fees."  (*Ibid*., italics added.)  "[T]he trial court has broad authority to determine the amount of a reasonable fee.  [Citations.]  As we have explained:  'The "experienced trial judge is the best judge of the value of professional services rendered in his court, and while his judgment is of course subject to review, it will not be disturbed unless the appellate court is convinced that it is clearly wrong'— meaning that it abused its discretion."  (*PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1095.)

23

First, we note GGG has waived any challenge to the evidentiary sufficiency of the trial court's findings in support of its order. It claims the trial court abused its discretion by rejecting Lowe's testimony at the first hearing. GGG also claims the errors in its documentation were inadvertent.

A party seeking an award of attorney fees "'"'bear[s] the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates."'"'" (*Christian Research Institute v. Alnor* (2008) 165 Cal.App.4th 1315, 1320.) And, "An attorney fee dispute is not exempt from generally applicable appellate principles: 'The judgment of the trial court is presumed correct; all intendments and presumptions are indulged to support the judgment; conflicts in the declarations must be resolved in favor of the prevailing party, and the trial court's resolution of any factual disputes arising from the evidence is conclusive.'" (*Id.* at p. 1322; *Ellis v. Toshiba America Information Systems, Inc.* (2013) 218 Cal.App.4th 853, 882.) GGG's opening brief failed to present a complete and balance summary of the evidence on the attorney fee motion. As the foregoing case authority reflects factual issues, including the credibility of witnesses, are matters for the trial court to resolve. Under the foregoing authorities, we conclude GGG forfeited its evidentiary contentions.

Second, GGG claims the wrong trial judge ruled on the attorney fee motion. Not so. The judge who heard and decided the motion was the same judge who presided over trial and the numerous post-trial proceedings. This covers the time addressed to the parties' contract claims. The trial judge GGG suggests as a more appropriate choice to decide the attorney fee motion presided over the pretrial litigation concerning a receivership that had been established after work on the project ceased. (see *Garden Grove Galleria, LLC v. Cathay Bank* (Nov. 21, 2013, G046997) [nonpub. opn.].)

Finally, GGG argues a prevailing party's attorney fee claim governed by Civil Code section 1717 is entitled to a fee award as a matter of law even if it fails to provide truthful and adequate documentation for the request. We disagree.

24

In *Serrano v. Unruh* (1982) 32 Cal.3d 621, the Supreme Court noted "*Prevailing parties* are compensated for hours reasonably spent on fee-related issues. A fee request that appears unreasonably inflated is a special circumstance permitting the trial court to reduce the award or deny one altogether. 'If . . . the Court were required to award a reasonable fee when an outrageously unreasonable one has been asked for, claimants would be encouraged to make unreasonable demands, knowing that the only unfavorable consequence of such misconduct would be reduction of their fee to what they should have asked in the first place. To discourage such greed, a severer reaction is needful.'" (*Id.* at p. 635, fn. omitted.)

GGG contends *Serrano's* statement was only dicta. It further argues *Serrano* is inapplicable because it concerned a fee award under Code of Civil Procedure section 1021.5, not Civil Code section 1717. But the Supreme Court and lower appellate courts have quoted this language in subsequent cases involving other circumstances where a prevailing party is statutorily authorized to recover a reasonable attorney fee award. (*Chavez v. City of Los Angeles* (2010) 47 Cal.4th 970, 990-991 [Fair Employment and Housing Act; Gov. Code, § 12900]; *Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1137 [Anti-SLAPP motion; Code Civ. Proc., § 425.16]; *Concepcion v. Amscan Holdings, Inc.* (2014) 223 Cal.App.4th 1309, 1320 [class action settlement; Code Civ. Proc., § 1021.5].)

As Cathay notes, in *Ellis v. Toshiba America Information Systems, Inc., supra,* 218 Cal.App.4th 853, the Court of Appeal affirmed the denial of an attorney fee motion brought under Civil Code section 1717 where the trial court found the attorney lacked credibility and had submitted an inflated fee request. (*Id.* at pp. 881-885.)

Consequently, we conclude the trial court did not err in declining to award GGG any attorney fees in this case.

25

*3. The Striking of GGG's Request for Expert Witness Fees*

Finally, GGG claims the CLA expressly allowed a prevailing party to recover expert witness fees and therefore the trial court erred in striking its request for these fees from its costs memorandum.

We dealt with this issue in *Thrifty Payless, Inc. v. Mariners Mile Gateway, LLC* (2010) 185 Cal.App.4th 1050. There the parties' commercial lease provided, "the prevailing party is entitled to 'reasonable expenses,' including attorney fees, 'court costs, witness and expert fees.'" (*Id.* at p. 1056.) The trial court awarded expert witness fees to the prevailing party and we affirmed that ruling.

In reaching this decision the opinion noted: " Code of Civil Procedure section 1033.5 permits expert witness fees to be allowed as costs only if the expert witness is ordered by the trial court. (Code Civ. Proc., § 1033.5, subd. (a)(8).) Expert witness fees, when the expert witness has not been ordered by the court, are allowed only 'when expressly authorized by law.' (Code Civ. Proc., § 1033.5, subd. (b)(1).) Generally, when a contract provision states only that a prevailing party is entitled to '"reasonable attorney's fees and costs,"' or similar nonspecific language, courts have held that such language must be interpreted in light of the limits set forth in Code of Civil Procedure section 1033.5. [Citation.] Nevertheless, '[w]hile it is reasonable to interpret a general contractual cost provision by reference to an established statutory definition of costs, we do not discern any legislative intent to prevent sophisticated parties from freely choosing a broader standard authorizing recovery of reasonable litigation charges and expenses.'" (*Thrifty Payless, Inc. v. Mariners Mile Gateway, LLC, supra,* 185 Cal.App.4th at p. 1065.) Thus, "While the Legislature has not adopted a specific provision addressing the recovery of expert witness fees, such fees are, indeed, a cost, and when 'expressly authorized by law,' they are 'allowable as costs' under Code of Civil Procedure section 1033.5, subdivision (b)(1). We therefore see no reason why they

26

should not be recoverable as costs when the parties specifically agree to such a provision in a freely negotiated contract." (*Id.* at p. 1066.)

Here, the contract provision is distinguishable. It refers to "outside experts retained by Lender," i.e., Cathay. Civil Code section 1717, subdivision (a) renders the clause's unilateral allowance of attorney fees to be reciprocal, thus allowing GGG to recover its attorney fees even though the clause only mentioned Cathay. But GGG does not cite to any similar statutory provision relating to expert witness fees. Consequently, we affirm the trial court's ruling on Cathay's motion to strike the request for expert witness fees.

DISPOSITION

The judgment and postjudgment order are affirmed. Each party shall bear its own costs and attorney fees on appeal.

RYLAARSDAM, ACTING P. J.

WE CONCUR:

IKOLA, J.

THOMPSON, J.

27