Filed 3/3/16  Goldsholle v. Internet Brands CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| M. DAVID GOLDSHOLLE et al. | B256896 c/w B257755 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. YC063849) |
| v. | |
| INTERNET BRANDS, INC., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Stuart Rice, Judge.  Affirmed.

Advocate Law Group, Inc., Michael R. Hambly and Robert K. Scott, for Plaintiffs and Appellants M. David Goldsholle et al.

iGeneral Counsel, Wendy E. Giberti; and Leonard, Dicker & Schreiber LLP, Steven A. Schuman, for Defendant and Appellant Internet Brands, Inc.

\*      \*      \*

Plaintiffs sold their Internet website company to defendant for an upfront cash payment and a potential for further payouts if the website met certain performance benchmarks. When it did not meet the benchmarks triggering the largest payouts, plaintiffs sued defendant for not operating the website in "good faith" and for miscalculating the smaller payout that *was* due. The trial court, after a month-long bench trial, rejected the good faith claim but concluded the smaller payout was too small. Plaintiffs challenge the sufficiency of the evidence supporting the court's ruling. Defendant argues that plaintiffs waived their right to appeal and, in a cross-appeal, challenges the trial court's imposition of prejudgment interest on the amount of the underpayment. We deny the motion to dismiss the appeal and affirm the court's judgment because the appeal and cross-appeal lack merit.

## FACTS AND PROCEDURAL BACKGROUND

### I.      Facts

Because this appeal raises a sufficiency of the evidence challenge, we have summarized the facts in the light most favorable to the trial court's ruling. (*King v. State of California* (2015) 242 Cal.App.4th 265, 278 (*King*).)

#### A.      *DoItYourself.com website*

DoItYourself.com ("the website") is an Internet website that contains articles about home improvement for "do-it-yourselfers." Because the website sells no goods or services, it makes money by charging vendors for advertisements that are placed next to the articles. Internet users typically visit the website after they type a subject into a search engine—of which Google is the most important—and the website comes up as one of the first websites listed.

The website was started in 1995. By 2006, the website contained articles written specifically for the website as well as articles written for other purposes but syndicated for use on the website. All of the articles were aimed at maximizing the website's placement in response to Google searches. Indeed, the website had an average of 1,774,902 unique visitors each month from January through October 2006. In the first 11 months of 2006, the website had gross revenues of approximately $914,000.

2

In 2006, the website was owned by DoItYourself.com, Inc. (the corporation). At that time, the corporation had four shareholders—plaintiffs M. David Goldsholle (David), Lenore L. Goldsholle, Gerry H. Goldsholle (Gerry), and Advice Company (collectively, shareholders).

### B.  Sale of website

Defendant Internet Brands, Inc. (Internet Brands) owns and operates a diverse portfolio of websites on a number of subjects ranging from home to travel/leisure to automotive. In 2006, its chief executive officer was Robert N. Brisco (Brisco).

In December 2006, Internet Brands signed a contract with the corporation's majority shareholders—David and Gerry[1]—to acquire the website as well as affiliated websites; the parties and trial court recognized that the website was the primary asset. Internet Brands agreed to make payments to the corporation's shareholders of $8.5 million in cash and, if the website performed well, up to an additional $7 million in "earn-out" payments.

The contract contained four possible earn-out payments.

The first three were based on the website's "traffic"—that is, the average monthly number of unique visitors to the website. The contract defined three time periods: (1) April 2007 through December 2007; (2) calendar year 2008; and (3) calendar year 2009; for each, it set minimum and maximum "visitor targets" as well as a "maximum earn-out payment." Thus, if the website's traffic fell below the 2 million "minimum" target for 2007, the 2.5 million "minimum" target for 2008, or the 3 million "minimum" target for 2009, the four shareholders would receive nothing. If the website's traffic exceeded the 2.75 million "maximum" target for 2007, the 3.35 million "maximum" target for 2008, or the 4 million "maximum" target for 2009, the shareholders would receive the "maximum earn-out payment" of $2.5 million for 2007, $2.5 million for

---

[1]    We use these parties' first names to avoid confusion arising from their same last names. We mean no disrespect.

3

2008, and $2 million for 2009. If the traffic fell between the minimum and maximum targets, the shareholders would receive a prorated amount of the maximum payment.

The final earn-out payment was based on the website's "revenue," and was triggered if the shareholders received less than a total of $5 million from the traffic-based earn-out payments. If the website's "revenue" for 2008 and 2009 together was less than $3.5 million, the shareholders received nothing more; if it exceeded $7 million, the shareholders would receive another $5 million (less any payments made under the traffic-based earn-outs); and if it was in between, the shareholders would receive a prorated amount of the maximum payment. The contract defined "revenue" as "all revenues earned, calculated in accordance with generally accepted accounting principles, consistently applied, from the Websites during the period commencing January 1, 2008 and ending on December 31, 2009, net of third-party commissions, partner revenue shares, costs of goods sold, bad debt, credits and returns."

Section 3.4 of the contract provided: "During the Earn-Out Years [Internet Brands] will operate the websites and their related businesses in good faith, and will endeavor to commit resources to the Websites and their related businesses no different than those that [Internet Brands] would have committed had the obligation of [Internet Brands] to make Earn-Out Payments not existed."

C.     *Internet Brand's efforts and the website's performance in 2007, 2008 and 2009*

After acquiring the website in January 2007, Internet Brands declared the website to be one of its "priority" or "tier one" websites. Toward that end, Internet Brands reinvested 60 percent of the website's earnings back into the site, which was far higher than the 15 to 20 percent reinvestment rate for the other websites it owns. Internet Brands also took actions to increase the traffic to the website, including (1) trying to optimize the website's placement in Google search responses (so-called "search engine optimization")—a task that inevitably entails "guesswork" because Google keeps secret the ever-changing search algorithm that drives its search engine—by looking at competitors' websites, looking at what keywords yield the best results, and integrating

4

those keywords into the website's content, (2) increasing the stable of writers used to produce articles and other content for the website from 5 permanent employees and 15 freelance writers in 2007 to 15 permanent employees and 50 freelance writers in 2009, (3) posting thousands of additional articles on the website between 2007 and 2009 including articles of different lengths in order to optimize Google search engine results, (4) developing and deploying a new and more efficient computer platform (called Sequoia) to manage and post content onto the website, and (5) increasing the number of technical employees supporting the website from 15 in 2007 to 22 in 2009.

These efforts yielded ever-increasing traffic to the website. Between April 2007 and December 2007, the website had an average of 1,920,214 unique visitors per month (up from 1,774,902 in the first ten months of 2006). In 2008, the monthly average rose to 2,068,170. In 2009, it rose to 2,993,251. In 2010, it rose to 4,029,201. The website earned a total revenue of $3,951,000 in 2008 and 2009, an average of $1,975,500 per year (up from $914,276 in the first eleven months of 2006).

### D. Payouts

Internet Brands paid nothing under the traffic earn-out provisions because the website traffic in 2007, 2008, and 2009 did not meet the minimum targets. The $3.5 million in 2008 and 2009 revenue exceeded the minimum target of the revenue earn-out. From the $3,951,000 in revenue, Internet Brands deducted $304,385 as costs for hosting computer servers and content and $17,890 for bad debt/write-offs. The net revenue of $3,628,725 was prorated, and Internet Brands paid $183,893 to the shareholders on March 17, 2010.

## II. Litigation

In the operative First Amended Complaint, the shareholders sued Internet Brands and Brisco for (1) breach of contract for, among other things, not operating the website in good faith; (2) breach of the implied covenant of good faith and fair dealing; and (3) violating Corporations Code sections 25401 and 25504 in the purchase transaction. They sought up to $7 million in damages. Internet Brands filed a cross-claim against

David and Gerry for fraud and negligent misrepresentation regarding the legality of how the website was being operated.

The trial court summarily adjudicated the Corporation Code counts in favor of Internet Brands and Brisco. The shareholders appealed the ruling as to Brisco (as this was the only count in which he was named), and we affirmed the court's ruling. (See *Goldsholle v. Brisco* [Nov. 6, 2014, B250183] (nonpub. opn.).)

The matter proceeded to a month-long bench trial in October and November 2013. After entertaining post-trial briefing, post-tentative ruling objections, and post-judgment motions, the trial court issued a final amended statement of decision.

The trial court concluded that the shareholders' claims for breach of contract and breach of the implied covenant of good faith and fair dealing rested on the same basic assertion—that is, that Internet Brands violated both section 3.4 and the implied covenant by not operating the website in good faith from 2007 through 2009. The court ultimately found that "[t]he record does not support the conclusion that Internet Brands deliberately sabotaged its own profitability in 2007, 2008 or 2009 to avoid paying the plaintiffs some amount under the earn-out provisions of the contract." In reaching this conclusion, the court relied on Internet Brands' "top tier" prioritization of the website; on its reinvestment of 50 to 60 percent of the website's revenue; and on its development of a new content system and hiring of new writers and technical personnel. The court also rejected the shareholders' arguments (1) that Internet Brands had somehow caused the traffic levels to be just shy of the minimum targets in 2007 and 2009 (instead finding that Internet Brands had no control over Google search engine results and that "a myriad of immeasurable factors," such as a world-wide economic downturn, also affected traffic to the website), (2) that Internet Brands' decision to run the website differently than the shareholders would have preferred did not amount to bad faith.

The trial court nevertheless concluded that Internet Brands had not paid the shareholders all they were due under the revenue earn-out. The court found that Internet Brands erred in treating the cost of hosting servers and content as the "costs of goods sold" because, under generally accepted accounting principles, that term referred solely

6

to "costs related to the sale of tangible property items." Using the formulas set forth in the contract, the court concluded that Internet Brands owed an additional $434,834. The court also imposed prejudgment interest "on this readily ascertainable amount" from March 17, 2010 through the date judgment was entered on May 29, 2014.

The court also ruled against Internet Brands on its cross-claims.

Both the shareholders and Internet Brands filed timely notices of appeal. The shareholders challenge the sufficiency of the evidence supporting the court's ruling on their good faith and fair dealing claim, and Internet Brands challenges the prejudgment interest.

## DISCUSSION

### I.      Motion to Dismiss Appeal

Internet Brands has moved to dismiss the shareholders' appeal because the shareholders have obtained, and levied upon, a writ of execution in San Francisco County (as to one of Internet Brands' Wells Fargo bank accounts) and in Sacramento County (as to Internet Brands' entitlement to revenue from Google). A party cannot appeal an order or judgment if it has unconditionally, voluntarily and absolutely accepted the benefit of that order of judgment. (*H.D. Arnaiz, Ltd. v. County of San Joaquin* (2002) 96 Cal.App.4th 1357, 1362, 1364 (*Arnaiz*), citing *Schubert v. Reich* (1950) 36 Cal.2d 298, 299 and *In re Marriage of Fonstein* (1976) 17 Cal.3d 738, 744.) This rule prevents the party from inconsistently accepting and challenging the same order. (*Arnaiz*, at p. 1362; *Menges v. Robinson* (1933) 132 Cal.App. 647, 649 (*Menges*) ["an appellant may not accept the benefit of a judgment and at the same time assert his right to attack it"].)

The shareholders argue that their levies fall outside this rule of dismissal because they are "concededly entitled to the benefits [they have] accepted"—namely, the amount under the revenue earn-out—"and a reversal [on the issues they press on appeal]"—namely, the amounts due under the traffic earn-outs—"will not affect the[ir] right to those benefits." (*Trollope v. Jeffries* (1976) 55 Cal.App.3d 816, 825 (*Trollope*); *Al J. Vela & Assocs., Inc. v. Glendora Unified School Dist.* (1982) 129 Cal.App.3d 766, 770.) We agree. To be sure, if the shareholders were to prevail on appeal and, on remand, were to

7

be awarded $7 million under the traffic earn-outs, they would not receive any *revenue* earn-out. But, critically, they would still—overall—be awarded far more than the $484,384 earn-out the trial court already ordered. Because "it is inconceivable that [the shareholders] might receive less" by virtue of their appeal (*In re Marriage of Brockman* (1987) 194 Cal.App.3d 1035, 1045), they are "simply attempting to augment the judgment and the relief sought would not jeopardize the amount already collected" (*Heacock v. Ivorette-Texas, Inc.* (1993) 20 Cal.App.4th 1665, 1670). In such circumstances, an appeal is not inconsistent and hence not barred. (*Ibid.*)

Internet Brands raises two arguments in response. First, it argues that the amount the shareholders might receive under the *revenue* earn-out is tied to the amount they receive under the *traffic* earn-out. Admittedly, the exception allowing a party to pursue an appeal that augments the judgment amount is "most amenable to application" "where portions of the judgment appealed from are *conceptually severable* from those portions accepted." (*Trollope*, *supra*, 55 Cal.App.3d at p. 825, italics added.) However, as explained above, the interdependence of the calculation of the traffic and revenue earn-outs in this case does not alter the fundamental fact that the shareholders' appeal will only increase the amount of the overall earn-out payments to which they are entitled.

Second, Internet Brands contends that the amount of the shareholders' judgment might be reduced slightly if *Internet Brands* is successful in its cross-appeal of the award of prejudgment interest. For support, it cites *In re Marriage of Horowitz* (1984) 159 Cal.App.3d 377 (*Horowitz*), which held that a spouse seeking support payments cannot enforce an order for those payments when the *paying* spouse is also appealing them. (*Id.* at p. 387.) *Horowitz* arose in the context of a family law matter; we decline to extend it beyond that context for two reasons. To begin, and as noted above, the rationale underlying the dismissal rule IB cites is that a party cannot accept the benefit of an order and also appeal it because the two positions are "fatally inconsistent." (*Menges*, *supra*, 132 Cal. App. at p. 649.) However, a party does not act inconsistently when it accepts the benefits of an order that *the other party* is appealing. Further, the principle IB urges us to adopt would also mean that a party could effectively prevent levy of a judgment

8

without having to post a bond by simply appealing that judgment. We decline to broadly nullify the statutes governing the issuance and effect of appeal bonds. (See generally Code Civ. Proc., § 917.1.)

For these reasons, we deny the motion to dismiss the shareholders' appeal.

## II. Shareholders' Substantial Evidence Challenge

In assessing whether sufficient evidence supports a verdict, our task is to assess whether the record contains "substantial evidence, contradicted or uncontradicted, supporting" the verdict. (*King*, *supra*, 242 Cal.App.4th at p. 278.) """"Substantial evidence" is evidence of ponderable legal significance, evidence that is reasonable, credible and of solid value.'" (*Ibid.*, quoting *Roddenberry v. Roddenberry* (1996) 44 Cal.App.4th 634, 651.) In assessing the substantiality of the evidence, we "review the record in the light most favorable to the" verdict, resolve all conflicts in favor of the verdict, and draw all reasonable inferences in favor of the verdict. (*King*, at p. 278.) Although some courts have articulated the standard in a slightly different manner where, as here, the party challenging the sufficiency of the evidence on appeal is also the party that bore the burden of proof below (see *Sonic Manufacturing Technologies, Inc. v. AAE Systems, Inc.* (2011) 196 Cal.App.4th 456, 465-466 [asking whether the plaintiff-appellant's evidence was """"uncontradicted and unimpeached"""" and """"of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding""""]; *Agam v. Gavra* (2015) 236 Cal.App.4th 91, 108 (*Agam*) [same]), we agree that "these two standards of review come down to the same thing": Is "there *any* substantial evidence which supports the verdict in favor of the defendant"? (*Lobo v. Tamco* (2014) 230 Cal.App.4th 438, 442, fn. 2.)

The shareholders challenge the trial court's finding that Internet Brands operated the website "in good faith" in 2007 and 2008; they do *not* challenge the finding that Internet Brands acted in good faith in 2009. The shareholders level a two-pronged attack, arguing that (1) the evidence the court relied upon is not substantial, and (2) the evidence the court ignored dictates a ruling in the shareholders' favor.

9

### A.    *Evidence the trial court cited*

The shareholders argue the evidence the trial court cited in its order was either inadmissible or insubstantial.

### 1.    Inadmissible evidence

As noted above, the trial court relied in part upon evidence that Internet Brands had increased the size of its staff (both employees and freelance writers) contributing content to the website and that Internet Brands had increased the number of its technical employees dedicated to the website. This evidence was introduced through two summaries that were admitted as Exhibits 282 and 283. Both summaries were created by Internet Brands' personnel, based on its business records, as supplemented and/or clarified by conversations with Internet Brands' employees. The Internet Brands employees who created each summary testified at trial and were subject to cross-examination. The shareholders objected to these summaries both before and during trial, but the trial court overruled their objections. We review properly preserved evidentiary rulings for an abuse of discretion. (*Brinkley v. Monterey Financial Services, Inc.* (2015) 242 Cal.App.4th 314, 336.)

On appeal, the shareholders assert that the trial court abused its discretion in considering these summaries for two reasons. First, the shareholders note that Internet Brands never produced the business records underlying the summaries. The shareholders rely upon Federal Rules of Evidence, rule 1006, which makes production of those records a prerequisite to admission. (Fed. Rules Evid., rule 1006 ["(t)he proponent (of a summary) must make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place"].) However, the rule in California is different. Here, it is up to the court to decide, "in its discretion," whether to require production of the underlying records. (*Exclusive Florists, Inc. v. Kahn* (1971) 17 Cal.App.3d 711, 714; *Vanguard Recording Society, Inc. v. Fantasy Records, Inc.* (1972) 24 Cal.App.3d 410, 419 (*Vanguard*).)

Second, the shareholders assert that the summaries in any event should have been effectively excluded as a discovery sanction and that their admission is "unfair" under

Evidence Code section 1521, particularly in light of the nondisclosure of the underlying documents.  (Evid. Code, § 1521, Cal. Law Revision Com. Com. (1998) [noting how "whether the original was suppressed in discovery" is a relevant factor].)  A trial court may exclude evidence as a discovery sanction (*In re Marriage of Tharp* (2010) 188 Cal.App.4th 1295, 1317), and we review its decision to exercise (or not to exercise) this power for an abuse of discretion (*Kuhns v. State of California* (1992) 8 Cal.App.4th 982, 988).  The shareholders argue that the business records supporting the summaries were not produced in discovery, and that an Internet Brands' employee had certified during discovery that no further documents were responsive to the shareholders' document requests.  Evidence Code section 1521 provides that a court may admit "secondary evidence" of a writing—such as a summary covering underlying business records— unless the court determines (1) that a genuine dispute exists regarding the terms of the underlying records, or (2) "[a]dmission of the secondary evidence would be unfair." (§ 1521; accord, *Vanguard*, *supra*, 24 Cal.App.3d 410, 419 [providing for admission of summaries under former Evidence Code section 1509 if the underlying records were voluminous and would have been admissible into evidence].)

Both the law governing discovery sanctions and Evidence Code section 1521's "unfair"-ness prong imbue the trial court with discretion whether to admit the summaries in this case.  The court overruled the shareholders' objections on the grounds that Internet Brands' failure to produce underlying records stemmed from its failure to "keep traditional business records"; that it thus became necessary for Internet Brands to create the summaries for trial; and that the court viewed the shareholders' fairness objections as relevant more "to weight rather than admissibility."  These reasons are well within the boundaries of a reasonable jurist's discretion; the court consequently did not abuse its discretion in admitting the summaries.

### 2. Admissible, but insubstantial, evidence

The shareholders criticize five items of evidence the trial court cited as insufficient to justify its ruling.  First, they argue that the summary of writing personnel for the website should not be accorded much weight because the summary's author admitted that

11

she might not reach the exact same figures if she tried to construct the summary a second time. The author explained that the summary came from conversations with Internet Brands employees as well as from records, thus making it contingent to some degree on whether she would be able to talk to the same employees if she tried to construct the summary a second time. The author's frank admission does not rob the summary of any and all probative value. The shareholders relatedly contend that the summary of technology personnel is misleading because it lists 15 employees working on the website in 2007, but that those 15 did not devote *all* of their time to the website. However, the court was aware of this fact. Moreover, it appears to be of little consequence given that the summary also lists the number of "labor hours" spent on the website in 2007, 2008, and 2009, and that figure indicates a steady increase from 10,091 hours in 2007 to 15,122 hours in 2009.

Second, the shareholders contend that the testimony that Internet Brands was re-investing 50 to 60 percent of the website's revenues did not clearly pertain to 2007 and 2008 as well as 2009. They are wrong. In the colloquy leading up to that answer, the questioning attorney explicitly noted that the questions pertained to "the end of '07 through '08 and '09."

Third, the shareholders assert that Internet Brands prepared a list of the authors who wrote thousands of articles added to the website between 2007 and 2009, but that the list was misleading because it did not highlight the testimony of Internet Brands' employees who indicated that the second, third and fourth highest-producing authors wrote their articles in 2009, rather than in 2007 or 2008. The trial court nevertheless had before it evidence that Internet Brands was not standing idle in 2007. It added 20 writers (5 employees and 15 freelance) to work on the website in 2007; those writers were producing 5 to 20 articles per week in 2007; and Internet Brands increased its staff by another 22 writers (7 employees and 15 freelance) in 2008.

Fourth, the shareholders argue that the Sequoia content management system did not come online until 2010 or 2011. Although some witnesses testified that Internet Brands did not fully migrate to the new, Sequoia system until 2010 or 2011, those same

12

witnesses and others indicated that the migration occurred in phases; that the website was in one of the initial phases; and that it was being used by authors for the website in 2008 and 2009.

Lastly, the shareholders noted that the sole proof of Internet Brands' high priority to the website was the oral testimony of its witnesses; it was not written down anywhere. Because the "testimony of a single witnesses is sufficient" to prove a fact (*People v. Brown* (2014) 59 Cal.4th 86, 106 (*Brown*)), the absence of documentary proof is not consequential. The shareholders also note that one of Internet Brands' employees noted at her deposition that she was instructed just not to "break shit" and to "[k]eep shit running," which the shareholders assert is inconsistent with making the website a high priority. Because this employee was responsible for *many* websites, it is unclear that the instruction she received was relevant to the website at issue in this case; moreover, the trial court was within its rights to credit the other witnesses who testified to the high priority of the website in Internet Brands' portfolio.

### B.      *Evidence the trial court ignored*

The shareholders alternatively argue that the trial court erred in giving insufficient weight to their purported evidence of "bad faith." This argument fails for two reasons— one legal and one factual.

Legally, what matters to substantial evidence review is whether the record contains evidence that supports the trial court's ruling; whether the record *also* contains evidence that points the other way is accordingly irrelevant. (See *People v. Hicks* (2014) 231 Cal.App.4th 275, 286 ["conflicting evidence . . . does not cast doubt on the trial court's factual findings because we review factual findings for substantial evidence"].) In light of our conclusion, noted above, that the evidence the trial court relied upon in reaching its verdict is substantial, the only way we could overturn the court's ruling is if we reweighed the evidence and came to a different conclusion, but that is precisely what the substantial evidence standard prohibits. (*Brown*, *supra*, 59 Cal.4th at p. 106 ["we do not reweigh evidence"].)

13

Factually, when we examine the evidence the shareholders have highlighted, it does not dictate a ruling in their favor as a matter of law. (See *Agam*, *supra*, 236 Cal.App.4th at p. 108.) The shareholders point to four items of evidence.

First, they argue that the monthly visitor traffic of 1,920,214 in 2007 is suspiciously close to the minimum target of 2 million for that year, and that the monthly visitor traffic of 2,993,251 in 2009 is suspiciously close to the minimum target of 3 million for that year. That may be true, but there was no dispute that *Internet Brands* had no control over how the Google search engine ranked the website, and thus had no control over how many Internet users saw—and therefore visited—their website. Instead, traffic to the website is driven in part by the content on the website, and in part by the economy, the changing Google algorithm, publicity, and societal trends. The Great Recession in late 2008 was an economic factor that likely affected the traffic. In any event, Internet Brands' lack of control counters the inference of nefarious manipulation.

Second, the shareholders detail a number of ways in which Internet Brands should have operated the website, such as by writing more "high quality" articles, writing longer articles, assigning personnel dedicated to the website, setting traffic growth benchmarks, keeping written records, and building external links to the website. These arguments rest on the premise that Internet Brands did not operate the website in "good faith" because its efforts were not successful, because it did not throw *all* of its resources at the website immediately, and/or because it did not operate the website the same way the shareholders would have.

This premise is invalid. To be sure, "good faith" is to be assessed objectively. (*Carma Developers (Cal.), Inc. v. Marathon Development California, Inc.* (1992) 2 Cal.4th 342, 372-373.) However, even if we assume that Internet Brands' promise to operate the website in "good faith" means that it was required to take "commercially reasonable" actions and to expend its "best efforts"—which is both contrary to what the parties negotiated when they rejected a "commercial reasonableness" standard and contrary to what some of the cases indicate (*California Pines Property Owners Assn. v.*

14

*Pedotti* (2012) 206 Cal.App.4th 384, 395 & fn. 3 (*California Pines*) ["best efforts" is more exacting than good faith])—those duties still do not obligate Internet Brands to guarantee success (*Bare v. Richman & Samuels* (1943) 138 P.2d 372, 376 ["best efforts" is not a guarantee]), do not require Internet Brands to make "every conceivable effort" (*California Pines*, at p. 394 ["best efforts does not mean every conceivable effort"]), and do not obligate Internet Brands to exercise the same business judgment as the shareholders (see *Lamden v. La Jolla Shores Clubdominium Homeowners Assn.* (1999) 21 Cal.4th 249, 257 [business judgment rule does not permit a court to substitute its judgment for how a business should be run]). There is more than one way to run a website, and the evidence the trial court cited constitutes substantial evidence that Internet Brands operated the website in good faith and, in the process, managed to increase the website's traffic *and* its revenue during each year in the 2007 to 2009 period.

Third, the shareholders argue that Internet Brands' erroneous deduction for the cost of running their servers when calculating the revenue earn-out evinces a malicious motive that should be attributed to all of its actions. As the trial court noted, Internet Brands presented evidence as to why it plausibly believed these costs were properly considered "costs of goods sold"; the court simply disagreed with that belief and instead applied the generally accepted definition. Internet Brands did not maliciously withhold the revenue earn-out.

Lastly, the shareholders assert that the contract itself created a disincentive to act in good faith because, once the revenue earn-out minimum was reached, IB would be obligated to pay out $1.42 for each $1 of website revenue brought in. Of course, the fact that the contract created this financial temptation is not evidence that IB gave in to that temptation. The substantial evidence cited above indicates IB did not.

For all these reasons, we reject the shareholders' substantial evidence challenge. In light of this ruling, we need not reach Internet Brands alternative argument that the shareholders failed to prove any damages. We also reject Internet Brands' request for sanctions; while without merit, the shareholders' appeal was not frivolous.

15

### III. Internet Brands' Prejudgment Interest Challenge

A trial court must award prejudgment interest on a damages award when those damages "vest[] in th[at] person upon a particular day" and are "certain, or capable of being made certain by calculation." (Civ. Code, § 3287, subd. (a).) "'Damages are deemed certain or capable of being made certain . . . where there is essentially no dispute between the parties concerning the basis of computation of damages if any are recoverable but where their dispute centers on the issue of liability giving rise to damage. [Citation].'" (*Leff v. Gunter* (1983) 33 Cal.3d 508, 519.) Put differently, prejudgement interest is owing as long as the "'*defendant* actually know[s] the amount owed'" or "'could . . . have computed that amount'" "'from reasonably available information.'" (*Cassinos v. Union Oil Co.* (1993) 14 Cal.App.4th 1770, 1789 (*Cassinos*), quoting *Chesapeake Industries, Inc. v. Togova Enterprises, Inc.* (1983) 149 Cal.App.3d 901, 907, 911.) An award of prejudgment interest "compensate[s] the injured party[] [by] mak[ing] that party whole for the accrual of wealth which could have been produced during the period of loss." (*Cassinos*, at p. 1790.) Because this is a question turning on the meaning of the statute, our review is de novo. (*Union Pacific Railroad Co. v. Santa Fe Pacific Pipelines, Inc.* (2014) 231 Cal.App.4th 134, 198.)

The trial court awarded prejudgment interest on the amount by which Internet Brands had underpaid the revenue earn-out (that is, $434,834) from the date on which it paid the shareholders the inadequate amount (March 17, 2010) through the date of judgment. This was not error. The contract set forth detailed and specific formulas by which Internet Brands was to pay the traffic earn-outs and, if necessary, the revenue earn-out. Once the court determined that the "cost of goods sold" did not include the cost of maintaining servers, computation of the damages became a simple matter of plugging the new numbers (that is, the monthly traffic to the website and the website's revenue in 2008 and 2009) into the contract's formulas.

Internet Brands raises three arguments in response. First, it argues that the calculation of the revenue earn-out turns, in part, on the calculation of the traffic earn-outs. Because the shareholders' lawsuit disputed the traffic earn-outs, Internet Brands

16

argues, it was impossible to calculate the revenue earn-out until the trial court ruled on the shareholders' claims. This argument confuses the question of liability (which was disputed) with the question of how to calculate damages (which was not). Indeed, the issue on appeal is whether Internet Brands operated the website in "good faith." But this a question of liability and, as noted above, whether *liability* is disputed is of no consequence to the certainty of *damages*.

Second, Internet Brands argues that damages are uncertain "where there is a large discrepancy between the amount of damages demanded in the complaint and the size of the eventual award." (*Polster, Inc. v. Swing* (1985) 164 Cal.App.3d 427, 435.) Here, Internet Brands continues, the shareholders demanded $7 million in their complaint but were awarded only $434,834. We reject this argument. As an initial matter, a large discrepancy is not the sine qua non of certainty under Civil Code section 3287; at most, it "militates against a finding of [] certainty." (*Ibid.*) More to the point, the discrepancy in this case is attributable entirely to questions of *liability*, not to the certainty of damages. The shareholders alleged that they were entitled to $7 million based on Internet Brands' lack of good faith *or* entitled to a lesser amount of additional money under the revenue earn-out due to improper deductions; the trial court disagreed with them on the former, but agreed with them on the latter. As detailed above, the amount owed—once the court decided those questions of liability—was readily ascertainable from the undisputed traffic and revenue data.

Lastly, Internet Brands asserts that the shareholders themselves were not able to calculate what was owed because, in the operative complaint, they alleged an improper deduction of $322,275 from the revenue earn-out, but their expert testified to an improper deduction of $304,385. The difference between these figures is the $17,890 deduction for bad debts/write-offs, which their expert ultimately conceded was appropriate. This difference is one of liability, not the calculation of damages.

**DISPOSITION**

The judgment is affirmed.  Each party to bear its own costs.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.
HOFFSTADT

We concur:

_____, Acting P.J.
ASHMANN-GERST


_____, J.
CHAVEZ